IN THE UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

---

Nos. 24-1302, 24-1322, 24-1491

---

UNITED STATES OF AMERICA,
Appellee

v.

ORONDE SHELTON,
Appellant

---

Appeal from a judgment entered
in the United States District Court for the Western
District of Pennsylvania at
Nos. 2:21-cr-00216-001, 2:09-cr-232.

---

BRIEF FOR APPELLANT

---

ELISA A. LONG
Federal Public Defender

RENEE PIETROPAOLO
Assistant Federal Public Defender

Federal Public Defender
Western District of Pennsylvania
1001 Liberty Avenue, Suite 1500
Pittsburgh, PA  15222
(412) 644-6565

# TABLE OF CONTENTS

Table of Authorities ......................................................................iii

Statement of Jurisdiction........................................................... 1

Statement of Related Cases and Proceedings ........................... 2

Statement of the Issues............................................................... 3

Concise Statement of the Case .................................................. 5

    I.    Statement of Relevant Facts ..................................... 5

    II.   Procedural History ................................................. 15

Summary of the Argument ...................................................... 18

Argument ................................................................................. 20

    I.    The district court erred by applying a four-level increase in the offense level for use of a firearm "in connection with another felony offense" because Mr. Shelton was justified in instinctively returning fire after assailants overtook him on the roadway and began shooting at him. .. 20

          A.    Mr. Shelton is ambushed by armed assailants on the roadway and returns fire before extricating himself from the attack.............................................. 22

          B.    Because Mr. Shelton acted within his instinct for self-preservation and within the boundaries of Pennsylvania law when he used the firearm to defend himself from armed assailants who were shooting at him, he was not criminally responsible for recklessly endangering any bystanders. ....................................... 24

i

1.   The district court erred in relying on its determination that Mr. Shelton was not justified in continually possessing the firearm between March and April 2021 to conclude he was not justified in using the firearm to return fire on March 17th. ........................................................ 32

2.   The instant offense of conviction is not "another felony offense" and cannot support the four-level increase under § 2K2.1(b)(6). .................... 34

C.   The court's erroneous calculation of the guidelines requires that the sentence be vacated and the case be remanded for resentencing. ............................ 37

II.   By basing its upward variance to the statutory maximum for the firearms possession and its consecutive top-of-the-revocation-range sentence for the supervised release violation on improper factors and factors fully captured by the guidelines, the district court imposed a procedurally and substantively unreasonable sentence ........................................................ 39

III.   Sections 922(g)(1) and 922(o) violate the Second Amendment facially and as applied to Mr. Shelton ............ 51

Conclusion ............................................................ 67

Certificate of Bar Membership

Certificate of Compliance

Volume I of Appendix for Appellant ...................................... 1-23

Certificate of Service

# TABLE OF AUTHORITIES

**Cases:**

*Avitabile v. Beach*, 368 F. Supp. 3d 404 (N.D.N.Y. 2019) ...................... 60

*Ayotte v. Planned Parenthood*, 546 U.S. 320 (2006)................................ 64

*Binderup v. Att'y Gen.*, 836 F.3d 336 (3d Cir. 2016) .............................. 51

*Caetano v. Massachusetts*, 577 U.S. 411 (2016) .............................. 56, 59

*Class v. United States*, 583 U.S. 174 (2018) ............................................. 4

*Commonwealth v. Bayard*, 309 A.2d 579 (Pa. 1973)................................ 29

*Commonwealth v. Fisher*, 420 A.2d 427 (Pa. 1980) ................................ 30

*Commonwealth v. Fowlin*, 710 A.2d 1130 (Pa. 1998) ..... 24, 25, 26, 31, 39

*Commonwealth v. Palmer*, 359 A.2d 375 (Pa. 1976)................................ 29

*Commonwealth v. Samuel*, 590 A.2d 1245 (Pa. 1991) ............................ 28

*Commonwealth v. Ventura*, 975 A.2d 1128 (Pa. Super. 2009) ............... 29

*District of Columbia v. Heller,* 554 U.S. 570 (2008).................... 53, 55, 56

*Friedman v. City of Highland Park*, 784 F.3d 406 (7th Cir. 2015) ........ 60

*Gall v. United States*, 128 S. Ct. 586 (2007) ............................... 40, 41, 43

*Gov't of Virgin Islands v. Lewis*, 620 F.3d 359 (3d Cir. 2010)............... 33

*Holguin-Hernandez v. United States*, 140 S. Ct. 762 (2020)................... 3

*Los Angeles v. Patel*, 576 U.S. 409 (2015)................................................ 65

*Maloney v. Singas*, 351 F. Supp. 3d 222 (E.D.N.Y. 2018) ....................... 59

*New York State Rifle & Pistol Association, Inc. v. Bruen*,
   597 U.S. 1 (2022) ......................................................................... *passim*

*People v. Burns*, 79 N.E.3d 159 (Ill. 2015) ............................................. 65

*Range v. Att'y Gen.*, 69 F.4th 96 (3d Cir. June 6, 2023) (*en banc*),
   *cert. granted, judgment vacated*, No. 23-374 603 U.S. ___
   (July 2, 2024) ................................................................................ *passim*

*Respublica v. Cobbett*, 3 U.S. 467 (1798) ................................................ 66

*Roper v. Simmons*, 543 U.S. 551 (2005) ................................................ 46

*State v. Langford*, 3 Hawks 381 (N.C. 1824) ......................................... 61

*State v. Langford*, 10 N.C. 381 (1824) ................................................... 62

*United States v. Brito*, 979 F.3d 185 (3d Cir. 2020) .............................. 39

*United States v. Brown*, 47 F.4th 147 (3d Cir. 2022) ............................ 11

*United States v. Carrasquillo-Sánchez*, 9 F.4th 56 (1st Cir. 2021) ........ 45

*United States v. Flores-Mejia*, 759 F.3d 253 (3d Cir. 2014) .................... 3

*United States v. Garcia-Perez*, 9 F.4th 48 (1st Cir. 2021) ...................... 44

*United States v. Grier*, 475 F.3d 556 (3d Cir. 2007) ............................... 3

*United States v. Haymond*, 588 U.S. 634 (2019) ................................... 66

*United States v. Juarez*, 626 F.3d 246 (5th Cir. 2010) .......................... 36

*United States v. Langford*, 516 F.3d 205 (3d Cir. 2008) ................. 37, 38

*United States v. Levinson*, 543 F.3d 190 (3d Cir. 2008) ........................ 40

iv

*United States v. Lowry*, 480 F. App'x 133 (3d Cir. 2012) ........................ 41

*United States v. Mabery*, 686 F.3d 591 (8th Cir.2012)..................... 40, 42

*United States v. Merced*, 603 F.3d 203 (3d Cir. 2010)........................... 40

*United States v. Morgan*, No. 23-10047, 2024 WL 3936767
   (D.Kan., Aug. 26, 2024)................................................................ 60, 62

*United States v. Moore*, 111 F.4th 266 (3d Cir. Aug. 2, 2024) ........ *passim*

*United States v. Nasir*, 17 F.4th 459 (3d Cir. 2021) .............................. 20

*United States v. Olhovsky*, 562 F.3d 530 (3d Cir. 2009) ........................ 40

*United States v. Paolello*, 951 F.2d 537 (3d Cir. 1991).................... 32, 33

*United States v. Peppers*, 899 F.3d 211 (3d Cir. 2018).............................. 4

*United States v. Porter*, 933 F.3d 226 (3d Cir. 2019) ............................... 4

*United States v. Pugh*, 515 F.3d 1179 (11th Cir. 2008).......................... 41

*United States v. Rahimi*, 144 S. Ct. 1889 (2024)....... 51, 52, 54, 62, 63, 65

*United States v. Riley*, 574 F.Supp.3d 248 (E.D.Pa. 2021) ................... 31

*United States v. Rivera-Santiago*, 919 F.3d 82 (1st Cir. 2019) ........ 44, 45

*United States v. Wong*, 3 F.3d 667 (3d Cir. 1993).................................. 36

*Wooden v. United States*, 595 U.S. 360 (2022) ................................ 10, 12

**Constitution and Statutes:**

U.S. Const. Amend. II ..................................................... *passim*

18 Pa. C.S. § 505 ...............................................................20, 26-27

18 Pa. C.S. § 3735 ................................................................... 47

18 U.S.C. § 922(g)(1) ...................................................... *passim*

18 U.S.C. § 922(o) .......................................................... *passim*

18 U.S.C. § 924(e) ........................................................ 9, 11, 12

18 U.S.C. § 3553(a) .................................................... 37, 40, 41

26 U.S.C. § 5845(a) ................................................................ 35

26 U.S.C. § 5845(b) ..........................................................55-56

28 U.S.C. § 1291.................................................................... 1

## Sentencing Guidelines

U.S.S.G. § 2K2.1, comment. (n.14(C)).................................... 36

U.S.S.G. § 2K2.1(a)(4) ........................................................ 35

U.S.S.G. § 2K2.1(a)(4)(B) .................................................. 37

U.S.S.G. § 2K2.1(b)(6) ...................................... 21, 34, 35, 36

U.S.S.G. § 2K2.1(b)(6)(B) ................................ 14, 18, 35, 43

U.S.S.G. § 3D1.2(c) ............................................................ 35

U.S.S.G. § 3E1.1 ...................................................................... 12, 15

U.S.S.G. § 4A1.1 ........................................................................... 16

U.S.S.G. § 4A1.1(e) ....................................................................... 16

U.S.S.G. § 5G1.2 ........................................................................... 17

U.S.S.G. § 5H1.1 ........................................................................... 47

U.S.S.G. § 7B1.1 ........................................................................... 44

U.S.S.G. § 7B1.4 ........................................................................... 44

U.S.S.G. App. C. Vol. III, Amend. 825 (eff. Nov. 1, 2023) ...................... 17

## Other Authorities

4 William Blackstone, Commentaries on the Laws of England
   248 (1st ed. 1769) .................................................................... 66

Firearm Owner's Protection Act, Pub. L. No. 99-308, 100 Stat
   449, sec. 102 (May 19, 1986) .................................................... 60

U.S. Dep't of Justice, ATF, Firearms Commerce in the United States:
   Annual Statistical Update 2020 (2021) ..................................... 59

U.S. Dep't of Justice, ATF, Firearms Commerce in the United States:
   Annual Statistical Update 2021 (2021) ..................................... 59

U.S.S.G., Youthful Offenders in the Federal System, Fiscal
   Years 2010 to 2015 (May 2017) ................................................ 46

## STATEMENT OF JURISDICTION

This is a consolidated appeal from a combined sentence entered in the United States District Court for the Western District of Pennsylvania at 2:21-cr-00216 for alleged violations of federal law and at 2:09-cr-232 upon revocation of supervised release. The district court had jurisdiction under 18 U.S.C. § 3231.

The judgment was entered on February 14, 2024. Appx15-23.[1] Mr. Shelton filed a timely notice of appeal from both judgments (Nos. 24-1302 & 24-1322). Appx1-3. The government filed a cross-appeal (No. 24-1491). Appx4. This Court has jurisdiction under 28 U.S.C. § 1291, providing for appeal from a final decision of the district court.

---

[1] Citations to the Appendix filed contemporaneously with this brief are identified with "Appx_." Appendix Volume IV contains exhibits in digital format. The Presentence Investigation Report ("PSR") and Addendums were filed, with the Statement of Reasons, under seal pursuant to Local Appellate Rule 30.3(c).

## STATEMENT OF RELATED CASES AND PROCEEDINGS

In *United States v. Moore*, 111 F.4th 266 (3d Cir. Aug. 2, 2024), *petition for rehearing denied* Oct. 9, 2024, this Court rejected a Second Amendment challenge to 18 U.S.C. § 922(g)(1) because the appellant in that case was on supervised release at the time of his § 922(g)(1) offense. That appeal is not yet final as a petition for *certiorari* is due on or before January 7, 2025. *Range v. Att'y Gen.*, No. 21-2835 (3d Cir.) presents an as-applied challenge to § 922(g)(1) and has been listed for rehearing *en banc* on October 9, 2024. Counsel is unaware of any other related cases.

## STATEMENT OF THE ISSUES

**I.     Did the district court err by applying a four-level increase in the offense level for use of a firearm "in connection with another felony offense" because Mr. Shelton was justified in instinctively returning fire after assailants overtook him on the roadway and began shooting at him?**

**Preservation and Ruling:**

Mr. Shelton objected to application of this enhancement in his sentencing papers and at the sentencing hearing. *See* Appx643, 652-56; 698-99, 750. *See also* Appx765-69 & 772 (court summarizing preservation of objection) & 774-75 (defense counsel re-affirming written objections at sentencing). The court overruled the objection at Appx778-79.

**II.     Did the district court impose a procedurally and substantively unreasonable sentence when it relied on factors fully captured by the guideline range, including an improper factor, to upwardly vary to the statutory maximum for the firearms offenses and to impose a consecutive top-of-the-range sentence for the supervised release violation?**

**Preservation and Ruling:**

Claims of substantive unreasonableness are preserved by arguing for a sentence lower than the one ultimately imposed. *See Holguin-Hernandez v. United States*, 140 S. Ct. 762 (2020); *United States v. Flores-Mejia*, 759 F.3d 253, 256 (3d Cir. 2014) (*en banc*); *United States v. Grier*, 475 F.3d 556, 571 n.11 (3d Cir. 2007) (*en banc*). Mr. Shelton urged a sentence within the 51- to 63- month range, Appx810-11, and a concurrent sentence on the supervised release violation. Appx833. The court rejected both arguments and imposed the statutory maximum for the gun counts and a consecutive top-of-the-revocation-range sentence for the violation. Appx823-24, 834-35.

III. **Do 18 U.S.C. § 922(g)(1) and § 922(o) violate the Second Amendment facially or as applied to Mr. Shelton?**

**Preservation and Ruling:**

These issues were preserved by Mr. Shelton's motion to withdraw his plea and to dismiss the indictment charging 18 U.S.C. §§ 922(g)(1) and 922(o). Appx701-17, 743-47, which motions the district court denied, *see* Appx5-13 (Opinion and Order). *See generally Class v. United States*, 583 U.S. 174, 178 (2018) (holding that "a guilty plea [by itself does not] bar a criminal defendant from later appealing his conviction on the ground that the statute of conviction violates the Constitution."); *see also United States v. Porter*, 933 F.3d 226, 230 (3d Cir. 2019) (relying on *Class* for the proposition that a challenge to the constitutionality of the statute of conviction survives a guilty plea); *United States v. Peppers*, 899 F.3d 211, 225 & n.7 (3d Cir. 2018) (explaining "[o]ur precedent allows a defendant to directly challenge the constitutionality of the statute of conviction notwithstanding a guilty plea.").

4

## CONCISE STATEMENT OF THE CASE

On March 17, 2021, Oronde Shelton was ambushed by armed assailants on the roadway without warning and returned fire through his windshield, using a firearm equipped with a machine gun conversion device, before breaking away from the attack. That firearm was recovered weeks later, and Mr. Shelton was subsequently indicted for violating 18 U.S.C. § 922(g)(1), for possessing the handgun and ammunition, and § 922(o), because that handgun was affixed with a machinegun conversion device known as a "switch." Mr. Shelton filed a motion to dismiss the indictment under the Second Amendment, which the district court denied. At sentencing he argued that his momentary retaliatory use of force to defend himself against an active shooter was justified. He now appeals the denial of the motion to dismiss and the sentence, which was based on a misapplication of the law of justification and therefore procedurally and substantively unreasonable.

## I.    Statement of Relevant Facts

## Mr. Shelton's History and Characteristics

Oronde Shelton's father was a community activist who was shot while on his way to pick up Oronde and his sister at school when Oronde was just 9 years old. PSR ¶67. Appx666. This youthful trauma

necessarily impacted Mr. Shelton, as by the age of 13, he had his first interactions with the juvenile justice system. PSR ¶29. In high school, Mr. Shelton became involved with gang activity. This strained his relationship with his mother, who was deeply disappointed that his path was at odds with his father's cause. PSR ¶67.

Mr. Shelton's high school association with gang activity coincided with the onset of his problematic use of drugs and alcohol. PSR ¶75. It also led to his withdrawal from school during his senior year. PSR ¶78.

In 2008, at the age of 35, Mr. Shelton become involved in a drug conspiracy and was sentenced to ten years incarceration. *See* PSR ¶43. Mr. Shelton reported that while incarcerated for that offense, he participated in group substance abuse treatment. PSR ¶76. He also used that time to educate himself. He obtained his high school diploma and GED in 2008 and took advantage of educational and vocational opportunities. PSR ¶79. By 2017, he earned associate degrees in business and social and behavioral sciences. PSR ¶80. *See also* Appx675-76.

Following his release in 2018, Mr. Shelton made strides in re-connecting with family, overcoming his reliance on drugs and alcohol,

6

and obtaining employment. *See* Appx668. PSR ¶76, ¶77 (reporting that Mr. Shelton's drug tests while under supervision were negative for controlled substances). During this time, Mr. Shelton and his mother repaired their relationship. PSR ¶67. *See* Appx668. Indeed, Mr. Shelton described enjoying a morning cup of coffee with his mom as one of the joys of his new life. Appx753.

Between 2018 and 2019 Mr. Shelton was working full time with UPS. PSR ¶75. In fact, he had obtained a full-time job with UPS within weeks of his release. Appx811. He worked there for about a year before being accepted into an apprenticeship program with the Boilermaker's Union in Pittsburgh, Pennsylvania. PSR ¶¶81, 83. *See* Appx674, 685, 811. In Mr. Shelton's words, "for the first time in my life, I was actually proud that I was being productive… working or at the weld[ing] school. I became a proud member of Laborer Union Local 154." Appx811. "I was sincerely grateful for my freedom… [and] thrilled … [to] go to work in the morning…. I felt a sense of purpose after being absent from society for so long." Appx812.

The COVID-19 pandemic derailed Mr. Shelton's progress. *See* Appx669 (noting layoff); PSR ¶84. "[M]y world went sideways."

7

Appx812. He went from a structured prison setting, to a self-imposed structure of work and the gym, with "no gaps in my schedule," to no schedule at all. Appx811-12.

His ill-judged decision to arm himself following an attempt on his life culminated in the instant prosecution and lengthy incarceration sentence. Fifty-two year-old Oronde Shelton is currently serving a nearly 15-year sentence of incarceration from which he has no expectation of release until around his 61st birthday. *See* www.bop.gov/inmateloc/ (identifying Sept. 3, 2033 as release date). PSR, p.2.

**Mr. Shelton is ambushed on the roadway**

During the afternoon of March 17, 2021, an unidentified male in a Nissan accelerated to pull alongside a Dodge being driven by then 48-year-old Oronde Shelton firing bullets into the Dodge with one bullet passing through the passenger seat headrest. Appx392, 403, 602. Both vehicles came to an abrupt stop and additional gunfire was exchanged, with Mr. Shelton retaliating by shooting through his windshield toward

the Nissan before being able to extricate himself and speeding away, pursued by the Nissan. Appx83-84.[2]

Mr. Shelton maintained that his immediate reaction in returning fire was justified because he was in imminent danger of death or serious bodily injury, he had not provoked the use of force against himself, and he could not have avoided the necessity of using such force with complete safety by retreating.

Initially, Mr. Shelton was charged with possessing ammunition—the 26 shell casings that were found inside the Dodge he had been driving, Appx88—knowing that he had previously been convicted of crimes punishable by imprisonment for more than one year in violation of 18 U.S.C. §§ 922(g)(1) and 924(e). Appx113-15. A subsequent search (April 24, 2021) of his mother's Waldorf Street home resulted in seizure of a Glock pistol affixed with a Lego-brick sized device dubbed a "Glock switch," which easily attaches to the back of a handgun's slide

---

[2] Mr. Shelton's car was later found with a flat tire caused by a bullet. Security footage captured him leaving the area in a car registered to his sister and returning to his mother's home following the attack. Appx86-87, 91, 402, 536.

mechanism to turn a semiautomatic Glock into a fully automatic firearm. Appx424, 432-33, 792.

**Plea negotiations**

From the outset, Mr. Shelton acknowledged the government could prove his involvement and explained his goal was to avoid being sentenced to the Armed Career Criminal Act's mandatory minimum. *See generally* Appx102-108. There were continuing discussions of how various Supreme Court, Third Circuit and district court cases winding their way through the courts impacted resolution of that question. *See, e.g.,* Appx131-32. For example, in March of 2022, *Wooden v. United States*, 595 U.S. 360 (2022) issued, establishing that facts satisfying ACCA's three-occasions requirement must be charged in the indictment and proved to a jury beyond a reasonable doubt and making clear that that inquiry involves a more "multi-factored" and "holistic" analysis than whether offenses were distinct in time. *Id.,* 595 U.S. at 369-70.

The parties discussed whether Mr. Shelton would enter a plea to the original indictment; the prosecutor represented the government would supersede only if plea negotiations fell apart. Appx129-30, 142, 148. The defense made plain that the goal was to reach an agreement to

10

a non-ACCA sentence; trial was not contemplated. *See, e.g.*, Appx152, 159-60, 170, 185-86.

In May, 2022, defense counsel made a formal request to the U.S. Attorney to consider a plea to a different change to avoid any possibility of an ACCA sentence. Appx177. That offer was rejected mid-June 2022. Appx183-84.

As previewed at a status conference, the defense then moved to dismiss the § 924(e) charge based on a purely legal challenge to designation of his prior state drug convictions, committed three decades earlier, when Oronde Shelton was just 18 years old, as serious drug offense predicates within the meaning of the ACCA. *See* Appx187-230; 272-307. The court determined the motion was premature and deferred ruling until sentencing. Appx34. *See also* Appx779.

Plea negotiations continued. *See* Appx35 (Doc. Nos. 77 & 80).

In September 2022, counsel advised the district court of another recently decided case impacting application of the ACCA. *See* Appx308-11 (alluding in part to *United States v. Brown*, 47 F.4th 147 (3d Cir., August 29, 2022), which, as applied to Mr. Shelton's drug overbreadth challenge, precluded application of the ACCA). The defense requested a

postponement of the pretrial deadlines to facilitate negotiations and to ensure Mr. Shelton's eligibility for the third point for acceptance of responsibility under U.S.S.G. § 3E1.1 would not be impacted. *Id.* The court denied that motion, opining that requiring the parties to comply with pretrial deadlines would not impact plea negotiations. Appx36 (Doc. 81).

The pretrial filing deadlines precipitated the government's filing of a superseding indictment to address the Supreme Court's decision in *Wooden*. *See also* Appx319-20. Count 1 was amended and charged possession of *both* the spent casings that were was recovered from the Dodge *and* the Glock, model 17, 9mm pistol with the attached machine gun conversion device that was seized during the April 2021 search in violation of 18 U.S.C. §§ 922(g)(1) and 924(e). Appx312-14. Count Two charged possession of precisely the same firearm, the Glock model 17, 9mm pistol equipped with the machine gun conversion device, under 18 U.S.C. § 922(o). Appx315-16. *See generally* Appx 42 (joint motion to bifurcate (Doc. 128); defendant's proposed bifurcated verdict slip (Doc. 120); joint proposed *Wooden* instruction (Doc. 130 at 9)).

Nevertheless, "serious plea negotiations" continued. Appx319-20.

12

Shortly thereafter, new counsel entered his appearance on behalf of Mr. Shelton. Appx39. After the court denied his request to postpone the trial date, *id.*, new counsel submitted a proposed jury instruction on the defense of justification. Appx325-27. The government requested a pretrial hearing to preclude the defense. *See* Appx340-44. The defense opposed a pretrial hearing as "unnecessary," adding that the proposed justification defense, on which the *defense* bore the burden, was based entirely on evidence that was already in the record and had been disclosed through discovery. Appx328-39. *See also* Appx663. The court granted the government's request for an evidentiary hearing. Appx43.

On January 2, 2023, the defense moved to postpone the justification hearing and trial date while he continued to pursue plea negotiations, explaining that a continuance for this purpose "will likely render unnecessary both an evidentiary hearing and trial." Appx43 (Doc.137). The court briefly postponed that hearing. Appx44 (Doc. 140).

Following an evidentiary hearing, the district court denied the request for a justification instruction. Appx614-41.

Almost immediately thereafter the case was set for a guilty plea. Appx45 (Doc. 148). The change of plea was conducted February 16, 2023

by videoconferencing because of the continuing COVID emergency. *See* Appx45 (Doc. 151).

**Sentencing Guideline Rulings**

By text order entered January 16, 2024, the court notified the parties of its intent to grant Mr. Shelton's objection to application of the Armed Career Criminal Act. *See* Appx48. The district court ruled that Mr. Shelton's prior convictions were not "serious drug offenses" because Pennsylvania's definition of cocaine is broader than the Controlled Substance Act's definition of cocaine. *See* Appx779-88. In relevant part, the Court ruled that at the time of Mr. Shelton's 2021 federal gun offense, the Pennsylvania drug statute swept more broadly than the federal definition because Pennsylvania criminalized ioflupane but the federal CSA did not. Appx782-83. The district court then rejected each of the government's counterarguments. Appx783-86.

Over objection, the court applied the four-level enhancement for use of a firearm in connection with another felony offense under U.S.S.G. § 2K2.1(b)(6)(B), explaining that Mr. Shelton fired in retaliation at an individual who had ambushed him on the roadway.

14

The court rejected Mr. Shelton's argument that he was justified in momentarily using force to defend himself. Appx787-88. *See* PSR ¶21.

The court also ruled that Mr. Shelton was not entitled to a third point for acceptance of responsibility under U.S.S.G. § 3E1.1. The government argued that the February 2023 evidentiary hearing to assess whether Mr. Shelton was entitled to a jury instruction on the justification defense amounted to preparing for trial. Notably, the court had refused Mr. Shelton's request to continue pretrial deadlines while the parties engaged in further plea negotiations and rejected Mr. Shelton's position that an evidentiary hearing was unnecessary even though the *defense* bore the burden to prove justification and the defense averred that it would be relying on information provided by the government in discovery.

## II.    Procedural History

Several weeks after the March 17, 2021 ambush, police recovered a firearm equipped with a machine gun conversion device. Mr. Shelton was thereafter indicted for violating 18 U.S.C. § 922(g)(1) and § 922(o). After the court denied his request for a jury instruction on the defense of justification, Mr. Shelton entered an open plea of guilty. Appx614-41.

**Motion to Dismiss**

Before sentencing, the *en banc* Third Circuit issued *Range v. Att'y Gen.*, 69 F.4th 96 (3d Cir. June 6, 2023) (*en banc*), *cert. granted, judgment vacated*, No. 23-374 603 U.S. ___ (July 2, 2024). Relying on *Range* and the Supreme Court's decision in *New York State Rifle & Pistol Association, Inc. v. Bruen*, 597 U.S. 1 (2022), Mr. Shelton moved to withdraw his guilty plea and to dismiss the indictment, arguing that 18 U.S.C. § 922(g)(1) and § 922(o) violate the Second Amendment on its face and as applied to him. Appx701-17, 743-47. By opinion and order dated November 28, 2023, the court denied the motions, *see* Appx5-13, and the case proceeded to sentencing.

**Mr. Shelton's Sentencing**

Mr. Shelton's offense resulted in a guideline range of 51 to 63 months (Criminal History Category III and Offense Level 20). *See* Statement of Reasons, p.1.[3] The court varied upward to sentence Mr.

---

[3] Effective November 1, 2023, the United States Sentencing Commission amended the "status points" provision of U.S.S.G. § 4A1.1 to apply only to individuals with seven or more criminal history points under the amended subsections (a) and (d), and to reduce the number of "status points" from two points to one point for such individuals. See U.S.S.G. § 4A1.1(e). On August 31, 2023, the Sentencing Commission determined that Amendment 821 would apply retroactively. *See*

Shelton to the 120-month statutory maximum at each count, with the sentences to be served concurrently, and to three years supervised release. Appx823-24.[4] Based on the same criminal conduct, he also had his supervised release revoked. The court sentenced him to a consecutive term of 57 months, the top of the 46- to 57 month-aggravated range and just 3 months shy of that statutory maximum. Appx834-35.

Mr. Shelton now appeals the conviction and both sentences.

---

U.S.S.G. App. C. Vol. III, Amend. 825 (eff. Nov. 1, 2023). The district court gave Mr. Shelton the benefit of that retroactive amendment. *See* Appx787.

[4] Disappointed with the court's determination that the Armed Career Criminal Act was inapplicable, the government urged the court to sentence Mr. Shelton as if it did apply by imposing consecutive sentences pursuant to U.S.S.G. § 5G1.2. The government affirmatively argued that the appropriate ***total punishment*** for the charged offenses would be captured by a 15-year sentence. *See* Appx804-05 (government requesting 10 years on count 1 and a consecutive five years on count 2). The court rejected the government's argument, adding it would not impose a sentence longer than 10 years even if the guidelines were higher. Appx829-30.

## SUMMARY OF THE ARGUMENT

Under Pennsylvania law, a person may use force toward another if he reasonably believes force is immediately necessary to protect himself against death or serious bodily injury, if he did not provoke the use of force, and if he did not violate any duty to retreat. An unidentified person ambushed Mr. Shelton as he was traveling midday on a busy roadway firing gunshots at Mr. Shelton and necessitating an immediate in-kind response. There was no evidence Mr. Shelton provoked the attack and no evidence he could have retreated in complete safety. Because Mr. Shelton's momentarily retaliatory use of force to defend himself was justified, he cannot be criminally liable for shooting into the aggressor's car or recklessly endangering bystanders.

The district court misapplied the law of justification, concluded Mr. Shelton's momentary use of force on the roadway required application of § 2K2.1(b)(6)(B)'s four-level enhancement for use of a firearm in connection with another felony offense, and also relied on that conduct to increase Mr. Shelton's sentence. The resulting sentence was procedurally and substantively unreasonable. The judgment should be vacated and the case remanded for resentencing.

18

Under a faithful application of *New York State Rifle & Pistol Association, Inc. v. Bruen*, 597 U.S. 1 (2022), 18 U.S.C. § 922(g)(1) and 922(o) violate the Second Amendment facially and as applied to Mr. Shelton. Because Mr. Shelton was on supervised release at the time of the instant offense, he recognizes that this Court's recent decision in *United States v. Moore*, 111 F.4th 266 (3d Cir. Aug. 2, 2024), likely governs this case. For preservation purposes, Mr. Shelton contends that *Moore* was wrongly decided.

# ARGUMENT

**I.    The district court erred by applying a four-level increase in the offense level for use of a firearm "in connection with another felony offense" because Mr. Shelton was justified in instinctively returning fire after assailants overtook him on the roadway and began shooting at him.**

**Standard of Review**: Interpretation of the Sentencing Guidelines is a legal question subject to plenary review. *United States v. Nasir*, 17 F.4th 459, 468 (3d Cir. 2021) (en banc).

Under Pennsylvania law, a person may use force toward another if he reasonably believes force is immediately necessary to protect himself against death or serious bodily injury, if the actor did not provoke the use of force against himself, and if the actor did not violate any duty to retreat. *See* 18 Pa. C.S. § 505. Here, an unidentified person in a Nissan opened fire on Mr. Shelton without warning as he was traveling "normally" on the roadway, necessitating an immediate in-kind response. Appx394. There was no evidence Mr. Shelton provoked the attack. There was no evidence he could have retreated with complete safety: He was overtaken on the roadway without warning as he began moving with traffic at a signal, blocked to his left by concrete barriers and "block[ed]" to his right by the shooting assailant, with cars ahead and behind him. *See* Appx698. Because Mr. Shelton was justified in

momentarily retaliating with force, he cannot be criminally liable for shooting at the aggressor's car or recklessly endangering bystanders.

The district court found as fact that Oronde Shelton "used a firearm to return fire on another individual after being fired upon" Appx778, but it concluded that in so doing he used the firearm in connection with another felony offense. *Id.*[5] *See also* PSR Addendum (identifying the use of a firearm to return fire as the other felony offense). The district court relied on its earlier determination that Mr. Shelton had not made out a justification defense to the §§ 922(g)(1) and 922(o) counts given his sustained possession of the firearm between March 17 and April 2021. Appx778. *See* Appx609-10. As will be shown, the district court erred in determining Mr. Shelton used the firearm in connection with another felony offense and increasing the base offense level by four levels under U.S.S.G. § 2K2.1(b)(6).

---

[5] Mr. Shelton's mother and sister lived in the first-floor Waldorf Street apartment, where the Glock was recovered. Appx436-37, 483. Mr. Shelton was arrested April 24, 2021 in the second floor apartment at that address. Appx435-37.

21

### A. Mr. Shelton is ambushed by armed assailants on the roadway and returns fire before extricating himself from the attack.

On March 17, 2021, Oronde Shelton had been shopping at a retail store in the North Hills of Pittsburgh before heading to his mother's apartment on Waldorf Street. Appx471-74. Mr. Shelton left Waldorf Street and was travelling "normally" on East Street in the far left lane of a two-lane roadway, stopping with traffic at a red light. Cars were in front and behind him and concrete Jersey barriers were to his left. *See* Appx394, 534-35; Appx Vol. IV (ch06_20210317151625.mp4 (hereinafter ch06) at 15:17:55-58). As he resumed travel, a Nissan that had turned into the right lane of East Street from a side street overtook the Dodge and fired multiple gunshots at Mr. Shelton from slightly in front of the Dodge. Appx395-96, 402 (officer opining that "all the shots were fired from just in front of Mr. Shelton's vehicle."). *See* Appx Vol. IV (ch06 at 15:17:47 (showing Nissan turning right onto East Street from Suismon Street)). Trooper Gary Messer affirmed that Mr. Shelton was fired upon first; he did not initiate the assault. Appx476. *See also* Appx534-35. The Dodge abruptly stopped, with the Nissan slightly ahead. Appx83, 535-36. Appx Vol. IV (ch04_20210317151625.mp3 (hereinafter ch04) at

15:18:02-09). Defense counsel described the assailant as attempting to "box [Mr. Shelton] in, in the middle of traffic." Appx571-72. Mr. Shelton immediately reacted by returning fire through his front windshield toward the Nissan. Appx83-84. There was a rapid exchange of gun fire before traffic moved and Mr. Shelton was able to steal ahead and around the Nissan to make an immediate right turn onto a side street (Foreland Street), pursued by the Nissan. Appx84, 534-36. *See* Appx Vol. IV (ch04 at 15:18:05-09). The court observed, "[t]he other driver followed [Mr. Shelton] and continued to fire, before driving away." Appx607.

An audio recording of the shooting obtained from a ShotSpotter gunshot-detection system reflects that approximately six semi-automatic shots were fired (from the Nissan at Mr. Shelton) and following a momentary pause fully automatic shots were fired (from the Dodge[6]) *while* additional semi-automatic shots continued to be fired (from the Nissan). *See* Appx Vol. IV (sensor_1105). Appx80-82, 337-38.

---

[6] The firearm ultimately recovered from Mr. Shelton was equipped with an auto sear, making it a fully automatic firearm. *See* Appx397-98. Thus, a single pull of the trigger rapidly released a flurry of bullets. Appx82-83.

Images of the Dodge reflect damage from the multiple bullets fired at Mr. Shelton. One bullet actually passed through the his front passenger seat headrest. Appx392, 399-400, 403, 602. Other bullet holes were in the passenger door, in the passenger window, under the mirror, toward the roof, on the hood above the wheel, and in the tire. Appx399-401, 601. Damage to the front windshield was caused by shots fired by Mr. Shelton from inside the Dodge. Appx399. Twenty-six spent shell casings that were found inside the Dodge. Appx88.

**B.    Because Mr. Shelton acted within his instinct for self-preservation and within the boundaries of Pennsylvania law when he used the firearm to defend himself from armed assailants actively shooting at him, he was not criminally responsible for recklessly endangering any bystanders.**

"[W]hen one is the victim of an attack, the assailant, not the victim, picks the time, the place, the manner, and the circumstances of the attack. Leisurely assessment of the circumstances and the danger to others is almost never a feature of such an assault, and most often, the best the victim can do is mount a defense, which hopefully will preserve his life. In many cases, the victim only has seconds to act … to avoid injury or death." *Commonwealth v. Fowlin*, 710 A.2d 1130, 1133-34 (Pa. 1998).

24

In *Fowlin*, after one man pepper-sprayed Fowlin and another aggressor drew his handgun in a crowded nightclub, Fowlin drew his own handgun and fired in the direction of his attackers, killing the aggressor and wounding an innocent bystander. The Pennsylvania Supreme Court found that the defendant's use of deadly force in self-protection was justified, explaining "Pennsylvania does not require one to stand by helplessly while he is injured or killed by an assailant." *Fowlin*, 710 A.2d at 1133-34.

After holding that the defendant / victim was justified in his use of force against his attackers, the Pennsylvania Supreme Court went on to hold that he could not be criminally liable for unintentionally inflicting harm on an innocent bystander—the Commonwealth had charged aggravated assault and reckless endangerment—while employing self-defense. *Fowlin*, 710 A.2d at 1134.

The Supreme Court recognized that the defendant's hurried instinctive response to the unlawful use of force may result in harm to bystanders, but it refused to craft a policy holding him criminally liable for potential or actual harm to a bystander: "[T]his court could fashion a rule of law which holds the defender criminally liable, but in doing so,

we would have furthered no policy of the criminal law. Instead, we would have punished a person who was acting within his instinct for self-preservation and, in an appropriate case, within the boundaries of our law." *Fowlin*, 710 A.2d at 1134.

In this case, Oronde Shelton was attacked without warning while driving on a busy street in the middle of the afternoon when armed assailants in a car overtook him from behind and fired multiple gunshots at him. Mr. Shelton did not pick the time or place for this attack and had seconds to act to avoid injury or death. He immediately grabbed his gun from the passenger seat and fired toward his assailant.

The district court found as fact that Oronde Shelton "used a firearm to return fire on another individual after being fired upon." Appx778. "He acted instinctively within [Pennsylvania] law in defending himself." *Fowlin*, 710 A.2d at 1134. Thankfully, no one was injured.

In that moment, Mr. Shelton reasonably believed he was in imminent danger of death or serious bodily injury and that it was necessary to use force to prevent such harm. *See* Pa. C.S. § 505.[7] Indeed,

---

[7] Section 505 provides in relevant part:

there was no dispute that Mr. Shelton reasonably believed the use of

force was necessary to avoid death or serious bodily injury when he was

being fired upon while driving. In that regard, the court assumed "the

momentary firefight on the interstate was an imminent threat…."

Appx611. And it agreed "the firearm was useful to [Mr. Shelton] during

a momentary firefight on March 17, 2021." Appx610.

---

**(a) Use of force justifiable for protection of the person.--**The
use of force upon or toward another person is justifiable when the
actor believes that such force is immediately necessary for the
purpose of protecting himself against the use of unlawful force by
such other person on the present occasion.

**(b) Limitations on justifying necessity for use of force.--**

    **\*\*\***
(2) The use of deadly force is not justifiable under this section
unless the actor believes that such force is necessary to protect
himself against death [or] serious bodily injury…; nor is it
justifiable if:

> (i) the actor, with the intent of causing death or serious
> bodily injury, provoked the use of force against himself in
> the same encounter; or

> (ii) the actor knows that he can avoid the necessity of using
> such force with complete safety by retreating….

27

Mr. Shelton testified without contradiction that he believed he would have been killed had he not retaliated. As support, he pointed to the bullet holes in the passenger headrest and passenger door. Appx539-40. Defense counsel watching the video described the assailant as attempting to "box [Mr. Shelton] in, in the middle of traffic" and opined that had Mr. Shelton not reacted as he did "he would be dead." Appx571-72, 574 (asking, "[a]t what point during …the March shooting could Mr. Shelton do anything besides pull his firearm to defend his life.").

There was no testimony or evidence that Mr. Shelton provoked the attack. *See generally Commonwealth v. Samuel*, 590 A.2d 1245, 1247-48 (Pa. 1991) (to establish an actor was the provoker, and hence not entitled to claim self-defense, there must be some evidence to support the inference that his acts constituted an "intent to cause death or serious bodily injury"; holding defendant's display of gun toward victim who refused to leave when asked was not provocation within the meaning of the statute and reversing convictions for voluntary manslaughter and possession of instruments of crime). To the contrary, Detective Song confirmed that Mr. Shelton had not sought out the

Nissan, which had entered the flow of traffic from an entirely different direction than Mr. Shelton. Appx395-96. Appx Vol. IV (ch06 at 15:17:04-27 (showing Dodge approaching and stopping at light on East Street); ch06 at 15:17:47 (showing Nissan turn onto East Street).

Nor was there evidence Mr. Shelton could have retreated with complete safety. "The use of force in self-defense is disallowed only where the defendant "[k]nows he can avoid the necessity of using such force with complete safety by retreating." *Commonwealth v. Palmer*, 359 A.2d 375, 378 (Pa. 1976); *see also Commonwealth v. Ventura*, 975 A.2d 1128, 1143 (Pa. Super. 2009). "The law … has never required an accused to elect an avenue of retreat where a reasonably prudent person would conclude that such a decision would increase his exposure to threatened harm." *Commonwealth v. Bayard*, 309 A.2d 579, 582 (Pa. 1973). "[I]f [the actor] believed he was 'cornered' or without an avenue of retreat, it necessarily follows that he did not know an avenue of retreat was available and thus, he would be excused from retreating and justified in using deadly force if the other requirements were present." *Palmer*, 359 A.2d at 378.

29

Mr. Shelton was boxed in in traffic at a light with cars in front and behind him and a wall of concrete barriers to his left. *See* Appx394, 534-35; Appendix Vol. IV (ch06 at 15:17:55-58). *See also* Appx698. He was just beginning to move with traffic when the Nissan's occupants overtook him and began firing multiple rounds causing him to abruptly stop. The Nissan pulled ahead and also stopped. Mr. Shelton believed the Nissan was "trying to block" his car and "prevent [him] from moving." Appx535-36. *See also* Appx655 (describing Mr. Shelton as "boxed in by the assailant's vehicle when he returned fire…to defend himself."). He grabbed his gun and shot through his windshield toward the Nisan. Appx535-36. There was a rapid exchange of gun fire before Mr. Shelton was able to speed ahead and around the Nissan to make an immediate right turn onto a side street (Foreland Street), pursued by the Nissan. Appx84, 534-36. *See* Appx Vol. IV (ch04 at 15:18:02-09).

Thus, Mr. Shelton's use of force was justifiable, and his valid exercise of self-defense negated criminal liability. *See also Commonwealth v. Fisher*, 420 A.2d 427 (Pa. 1980) (reversing voluntary manslaughter conviction where defendant "bore no responsibility for provoking the use of force inasmuch as the initial shot was fired without

30

warning by the decedent," and the Commonwealth could not defeat defendant's self-defense claim by showing he was not reasonably in fear for his life and could have safely retreated given that he was stunned by the initial attack). And because he acted within his instinct for self-preservation and the boundaries of Pennsylvania law, Pennsylvania would not hold him liable for recklessly endangering others when he instinctively fired shots. *See Fowlin*, 710 A.2d at 1133-34.

In light of the foregoing, the district court erred in relying on Mr. Shelton's actions in returning fire against armed assailants who were firing at him to conclude he used the firearm "in connection with another felony offense." *See* Appx778. *See generally United States v. Riley*, 574 F.Supp.3d 248, 259 (E.D.Pa. 2021) (refusing to apply four-level enhancement for use of a firearm in connection with another felony offense because the defendant had discharged the firearm in defense of others).

    **1.**    **The district court erred in relying on its determination that Mr. Shelton was not justified in continually possessing the firearm between March and April 2021 to conclude he was not justified in using the firearm to return fire on March 17th.**

In applying the 4-level enhancement, the court primarily relied on its earlier rejection of Mr. Shelton's request to present a justification defense to his charged possession of the Glock firearm between March and April 2021. But a lack of justification to excuse sustained possession of the firearm between March and April cannot be equated with a lack of justification to return fire against an assailant who ambushed him and was actively shooting at him.

To establish justification to excuse possession of the firearm, the accused must establish (1) he was under a present threat of death or serious bodily harm; (2) he did not recklessly place himself in a situation in which he would be forced to engage in criminal conduct; (3) he had no reasonable alternative to avoid the threatened harm; and (4) a direct causal relationship between the criminal action and the avoidance of the threatened harm. *United States v. Paolello*, 951 F.2d 537, 540 (3d Cir. 1991). A justification defense is unavailable if an accused maintained possession longer than necessary and failed to

32

dispossess himself once the threat had abated. *See Paolello,* 951 F.2d at 541-43; *Government of Virgin Islands v. Lewis*, 620 F.3d 359, 368 (3d Cir. 2010).

The district court here found that Mr. Shelton was not entitled to present a justification defense. Appx603-13. First, Mr. Shelton did not possess the gun only during the attack on March 17, 2021; rather, he possessed the firearm continuously for months "throughout the March 2021 through April 2021 timeframe charged…."Appx603-04, 609-10. Second, the court found that he was not under a present threat of death or serious bodily injury to excuse that months-long possession. Appx610. "Assuming that the momentary firefight on the interstate was an imminent threat, Mr. Shelton intentionally possessed the gun for a significant period on March 17th before that threat, as well as for a significant period of time after that threat had abated." Appx610-12. Thus, he maintained possession longer than necessary and did not dispossess himself once the threat had abated.

That Mr. Shelton was not under a present threat of harm during the entire period between March 17 and April 24, 2021, and so could not justify his "sustained" possession of a firearm during the charged period

does not undermine his justification to use the firearm to return fire upon assailants who ambushed him in traffic and were actively shooting at him. The court erred by equating a lack of justification to excuse the sustained unlawful possession with a lack of justification to excuse his momentary retaliatory use of force.

> **2.    The instant offense of conviction is not "another felony offense" and cannot support the four-level increase under § 2K2.1(b)(6).**

The court ruled in the alternative that even if it disregarded Mr. Shelton's use of the firearm to defend himself when he was overtaken on the roadway and fired upon, it would find the enhancement applies because "[p]ossessing a machine gun is a separate felony offense under … Section 922(o)." Appx778-79. In other words, the court determined that the *instant* felony offense of conviction was "*another* felony offense." This too was error under the guidelines' plain text.

Mr. Shelton pled guilty at Count One to possession of ammunition and a Glock model 17, 9mm pistol equipped with the machine gun conversion device in violation of 18 U.S.C. § 922(g)(1) and at Count Two to possession of that very same Glock pistol with a machine gun conversion device in violation of 18 U.S.C. § 922(o). Appx312-16. The

counts were found to involve substantially the same harm and were grouped. *See* U.S.S.G. § 3D1.2(c) (requiring grouping when "one of the counts embodies conduct that is treated as a specific offense characteristic in, or other adjustment to, the guideline applicable to another of the counts"), (d). *See also* PSR ¶19. That the offense involved a machine gun conversion device was captured by § 2K2.1(a)(4), which raises the base offense level from 14 to 20 when the "offense involved a" "firearm that is described in 26 U.S.C. § 5845(a)." In short, the machine gun conversion device attached to the pistol and charged at Count 2 is the instant offense of conviction.

Under § 2K2.1(b)(6), a four-level increase to the offense level applies if the defendant "used or possessed any firearm or ammunition in connection with another felony offense…." U.S.S.G. § 2K2.1(b)(6)(B). "Another" means "different or distinct from the one first considered"; "some other"; and "being one more in addition to one or more of the same kind." "Another." Merriam-Webster.com Dictionary, Merriam-Webster, https://www.merriam-webster.com/dictionary/another. The plain and unambiguous language of the guideline text illustrates that the instant felony offense of conviction, § 922(o), cannot be "another"

felony offense justifying the four-level enhancement. *See United States v. Wong*, 3 F.3d 667, 670-71 (3d Cir. 1993) (explaining Guideline interpretation most often begins and ends with the Guideline's text).

This plain reading of the guideline text is supported by Application Note 14(c)'s definition of "another felony offense." "'Another felony offense,' for purposes of subsection (b)(6)(B) means any federal, state, or local offense, other than the explosive or firearm possession or trafficking offense, punishable by imprisonment for a term exceeding one year, regardless of whether a criminal charge was brought, or a conviction obtained." U.S.S.G. § 2K2.1, comment. (n.14(C)) (emphasis added). As at least the Fifth Circuit has observed, by defining "[a]nother felony offense" as "any federal… offense, *other than the … firearms possession… offense…*," the Commentary thereby excludes from the definition of "another felony offense" "the possession … offense that serves as the basis for the defendant's conviction." *United States v. Juarez*, 626 F.3d 246 (5th Cir. 2010) (emphasis added).

Thus, the court erred in applying the four-level enhancement for use of a firearm in connection with another felony offense.

36

**C.    The court's erroneous calculation of the guidelines requires that the sentence be vacated and the case be remanded for resentencing.**

"[G]iven the importance of a correct Guidelines calculation" to the sentencing process and to an appellate court's ability to review for reasonableness, this Court has determined that "use of an erroneous Guidelines range will typically require reversal...." *United States v. Langford*, 516 F.3d 205, 215-18 (3d Cir. 2008). "[W]hen the starting point for the § 3553(a) analysis is incorrect, the end point, *i.e.*, the resulting sentence, can rarely be shown to be unaffected." *Id.*, 215, 217.

Without the erroneous four-level enhancement, the guideline range would have been 33 to 41 months or 30 to 37 months based on a base offense level of 20, *see* U.S.S.G. § 2K2.1(a)(4)(B), less three or two points for acceptance of responsibility.

The court sentenced Mr. Shelton to the 120 statutory maximum, providing minimal explanation for what was a significant 135% upward variance. Appx823. Though the court explained that it would not impose a sentence longer than 10 years even if the guidelines were higher, Appx829-30, it did not say the opposite. Nor could it have. If the guidelines were properly calculated, an upward variance to the

37

statutory maximum would have been even more dramatic and required

an even more thorough explanation.

Resentencing is required.[8]

---

[8] If this Court determines the Guidelines range was incorrectly calculated, it may remand both sentences without considering the reasonableness of the sentence as a correctly calculated Guideline range is a necessary precondition of reasonableness review. *See Langford*, 516 F.3d at 211, 214.

**II. By basing its upward variance to the statutory maximum for the firearms possession and its consecutive top-of-the-revocation-range sentence for the supervised release violation on improper factors and factors fully captured by the guidelines, the district court imposed a procedurally and substantively unreasonable sentence.**

**Standard of Review**: Criminal sentences are reviewed for reasonableness, generally an abuse-of-discretion standard. *United States v. Brito,* 979 F.3d 185, 189 (3d Cir. 2020).

Driving the upward variance to the statutory maximum for the grouped firearms offense and the top-of-the-guideline-range sentence, just three months shy of the statutory maximum, for the supervised release violation, was the district court's view that Mr. Shelton's use of a Glock equipped with a machine gun conversion device to return fire against his assailants on March 17th recklessly endangered the public. *See* Appx823-24, 834-35. As set forth, Mr. Shelton was the victim of the attack. It was "the assailant, not the victim, [who] pick[ed] the time, the place, the manner, and the circumstances of the attack." *Fowlin*, 710 A.2d at 1133-34. As such, Mr. Shelton's momentary, retaliatory use of force—albeit midday on a busy roadway—to defend himself from gunfire was within the bounds of Pennsylvania law; his valid exercise of self-defense negated criminal liability.

As this Court has repeatedly explained, "'procedural problems may lead to substantive problems, so that there are times when a discussion of procedural error will necessarily raise questions about the substantive reasonableness of a sentence.'" *United States v. Olhovsky*, 562 F.3d 530, 553 (3d Cir. 2009) (quoting *United States v. Levinson*, 543 F.3d 190, 193 (3d Cir. 2008)); *see also United States v. Merced*, 603 F.3d 203, 215 (3d Cir. 2010). Here, the district court's procedural error–its misapplication of the law of justification—resulted in an unreasonable sentence.

A sentencing court abuses its discretion and imposes a substantively unreasonable sentence when it is required by statute, 18 U.S.C. § 3553(a), to take specified factors into account and it "ignored or slighted a factor that Congress deemed pertinent." *Gall v. United States,* 128 S. Ct. 586, 607 (2007) (Alito, J., dissenting). *See United States v. Mabery*, 686 F.3d 591, 599 (8th Cir.2012) (an abuse of discretion occurs where the sentencing court fails to consider a relevant factor that should have received significant weight, gives significant weight to an improper or irrelevant factor, or considers only the

appropriate factors but commits a clear error of judgment in weighing those factors).

The district court calculated the advisory range to be 51 to 63 months and then dramatically upwardly varied (by 69 months or nearly six years) to impose the statutory maximum of 120 months. The greater the variance, the more thorough the justification must be. *See Gall*, 552 U.S. at 50. *See also United States v. Lowry*, 480 F. App'x 133, 135 (3d Cir. 2012) (reversing where district court's 400% upward variance was unaccompanied by a sufficiently thorough justification).

Here, the court's primary justification was its legally erroneous view that Mr. Shelton's use of a Glock equipped with a machine gun conversion device to return fire against his assailants on March 17 recklessly endangered the public. Appx828. The court abused its discretion because it placed inordinate weight on the seriousness of the conduct at the expense of the reason motivating the conduct (self-defense) and thereby imposed a sentence greater than necessary to achieve the purposes of sentencing. 18 U.S.C. § 3553(a). *See United States v. Pugh*, 515 F.3d 1179, 1191 (11th Cir. 2008) ("a district court's unjustified reliance on any one Section 3553(a) factor may be a

symptom of an unreasonable sentence."). In that regard, it is worth noting that the court claimed its sentence reflected Mr. Shelton's acceptance of responsibility. Appx826. But a sentence to the statutory maximum does not reflect any such consideration. In this way, the court gave significant weight to an improper factor, or at least committed a clear error of judgment in weighing that factor. *See Mabery*, 686 F.3d at 599,

Whether or not the guidelines were correctly calculated, the range fully accounted for each of the reasons the court articulated as justification for its sentence. Again, the court justified the upward variance by reference to the fact that Mr. Shelton "fired the machine gun… while driving a car on a public road in a well-populated area during the afternoon" of March 17, 2021, and so endangered the public. Appx828. It viewed the handgun, when fitted with the machine gun conversion kit, as "an extraordinarily dangerous weapon." Appx828. The court also focused on Mr. Shelton's criminal history, asserting without elaboration that it was "serious[]" and included multiple drug-trafficking convictions. Appx828-29. In addition, the court pointed to

Mr. Shelton's supposed history of violating provisions of court supervision and returning to criminal conduct. Appx829.

Each of these factors was fully accounted for by the guidelines. Relying on those same factors, without explaining why they are deserving of *extra* weight, reflects the clear error in weighing that is characteristic of substantive unreasonableness. *See Gall,* 128 S. Ct. at 607.

First, the district court relied on the fact that the public was endangered when Mr. Shelton fired back at his attackers on a roadway to apply § 2K2.1(b)(6)(B)'s four-level enhancement. Thus, these circumstances had already increased the guideline range by 22- to 27-months. (A base offense level of 24 yields a 63- to 78- month range while a base offense level of 20 yields a 41- to 51- month range).

Similarly, the fact that the offense involved a machine gun conversion device was also fully factored into the sentence, in multiple ways. First, the court cited that a machine gun conversion device was involved to apply the four-level increase under § 2K2.1(b)(6)(B). Second, the machine gun conversion device increased the base offense level from 12 to 20, thereby increasing the sentencing range by more than two

43

years. (A base offense level of 12 yields a 15- to 21- month range while a base offense level of 20 yields a 41- to 51- month range). Third, because the offense involved a machine gun conversion device, the grade of the Supervised Release Violation changed from Grade B to Grade A. *See* U.S.S.G. § 7B1.1. For a Grade B violation, the revocation range was 18 to 24 months. *See* U.S.S.G. § 7B1.4. For a Grade A violation, the revocation range ballooned to 46 to 57 months. *See* No. 2:09-cr-232 Doc. 76 (W.D.Pa., Jan. 20, 2023). The machine gun conversion device thus increased the revocation sentence by an *additional* more than three years (57 months – 18 months = 39 months).

Courts reviewing upward variances predicated on a district court's concern about the dangerous nature of machineguns have reversed explaining that concern is factored into the guidelines and ordinarily not entitled to extra weight. *See, e.g., United States v. Rivera-Santiago*, 919 F.3d 82, 85 (1st Cir. 2019) ("Given that the sentencing guidelines fully accounted for the nature of the firearm involved in the offense of conviction, the sentencing court abused its discretion in relying upon that factor to fashion an upwardly variant sentence."); *United States v. Garcia-Perez*, 9 F.4th 48, 54 (1st Cir. 2021); *see also United States v.*

44

*Carrasquillo-Sánchez*, 9 F.4th 56, 59 (1st Cir. 2021) (reversing where court based upward variance on violence in the community associated with machineguns). As the First Circuit has observed, the Sentencing Commission set the base offense level for machine guns higher *because* it understood they are unusually dangerous and lethal. *Rivera-Santiago*, 968 F.3d at 136 (1st Cir. 2020). When the district court in that case relied on the "efficient lethality" of machineguns to upwardly vary, the First Circuit reversed explaining these "concerns are universal in their application" to cases involving machineguns and cannot be used in the mine-run machine gun case to justify upward variance. *Id.*

The court also focused on Mr. Shelton's criminal history, asserting without elaboration that it was "serious[]" and included multiple drug-trafficking convictions. Appx828-29. Here again, criminal history is fully factored into the guideline range. If anything, the guidelines range overstated criminal history.

It cannot be overlooked that the bulk of Mr. Shelton's criminal history involves conduct committed when he was 25 and younger, including when he was a juvenile. *See* PSR ¶¶29-38. Even the government conceded that most of the youthful offenses were "relatively

45

minor." Appx690. The two drug offenses occurred more than three decades ago and appear to have been small sales made in quick succession when Mr. Shelton was just 18 years old. *See* PSR ¶¶31-32. That Mr. Shelton was sentenced to just six to twelve months suggests the state court made a different assessment of offense seriousness. *See id.*

Advances in developmental neuroscience and psychology endorsed by the Supreme Court and the Sentencing Commission illustrate that youthful offenders (those 25 or younger[9]) are less culpable than adult offenders. *See generally Roper v. Simmons*, 543 U.S. 551, 574 (2005). The Commission recognizes "[c]ertain risk factors may affect a youthful individual's development into the mid-20's and contribute to involvement in criminal justice systems, including environment, adverse childhood experiences, substance use, lack of educational opportunities, and familial relationships. In addition, youthful individuals generally are more impulsive, risk-seeking, and susceptible to outside influence as their brains continue to develop into young

---

[9] *See* U.S.S.G., *Youthful Offenders in the Federal System, Fiscal Years 2010 to 2015* at 1 (May 2017).

46

adulthood." U.S.S.G. § 5H1.1 (Nov. 1, 2024). Armed with advancements in understanding youthful brain development, behavior and culpability, the Guidelines now authorize a downward departure based on a consideration of the defendant's youth at the time of prior offenses. *Id.*

More recent offenses were assessed criminal history points. *See* PSR ¶¶40-43. The motor vehicle accident dating back to 2004, when Mr. Shelton was 31, stemmed from his abuse of alcohol and drugs and had tragic consequences—the unintentional causation of the death of a friend who was a passenger in the car. *See* 18 Pa. C.S. § 3735 (criminalizing the unintentional causation of the death of another as a result of driving under the influence). *See also* PSR ¶¶40-41. It was the 2008 drug conspiracy, committed when he was 35 years old, that had the most serious sentencing consequences.

Finally, the court relied on what it characterized as Mr. Shelton's history of violating provisions of court supervision and returning to criminal conduct. Appx829.

First, that Mr. Shelton violated the terms of supervision by committing the instant offense was fully factored into the sentence. He

was sentenced to the high end of the range, and the court imposed that

sentence consecutively.

Regardless, the court's characterization is on shaky footing and

cannot justify the upward variance.[10] Mr. Shelton was released October

9, 2018 to begin serving a protracted 10-year supervised release

sentence following his involvement a decade earlier (2008) in a

conspiracy to distribute an amount of heroin requiring a 10 year

statutory minimum. PSR ¶43. Following his release, Mr. Shelton made

strides in re-connecting with family, overcoming his reliance on drugs

and alcohol, and obtaining employment. *See* Appx668. PSR ¶76, ¶77

(noting that Mr. Shelton's drug tests while under supervision were

negative for controlled substances).

Within weeks of his 2018 release he had obtained a full-time job

with UPS. Appx811. He worked there for about a year before being

accepted into an apprenticeship program with the Boilermaker's Union.

PSR ¶¶75, 81, 83. *See* Appx674, 685, 811. In Mr. Shelton's words, "for

---

[10] The government elsewhere had referred to a violation of state parole taking place over a decade previously: Mr. Shelton was on state parole for the motor vehicle accident that resulted in the death of one of his friends, *see* PSR ¶¶40-41, when he engaged in the 2008 federal drug conspiracy, *see* Appx688.

the first time in my life, I was actually proud that I was being

productive… working or at the weld[ing] school. I became a proud

member of Laborer Union Local 154." Appx811. "I was sincerely

grateful for my freedom… [and] thrilled … [to] go to work in the

morning…. I felt a sense of purpose after being absent from society for

so long." Appx812.

During the 2-1/2 years he was on supervision, Mr. Shelton

otherwise complied with the conditions of supervision. He successfully

completed individual substance abuse counseling sessions in February

2019. PSR ¶77. He remained clean and sober. PSR ¶76. The probation

office documented his compliance with drug testing and employment

conditions and had not filed any violation petitions. Appx464-65; *see

also* Appx833-34. The government too acknowledged Mr. Shelton was

"otherwise following the rules" and characterized this behavior as

"positive." Appx832.

Parenthetically, following the April 2021 arrest, Mr. Shelton

continued to demonstrate his commitment to rehabilitation by pursuing

additional behavioral, educational, and vocational opportunities. *See*

Appx 672-86. *See also* Appx840-51 (certificates included for critical

thinking, computer skills, and cognitive awareness). Notably, Mr. Shelton has been successful in paralegal studies. *See* Appx 837-39.

In sum, Mr. Shelton's conduct while under supervision does not appear to be out of the ordinary and the court offered no explanation as to why it was deserving of extra weight.

In short, the district court abused its discretion in giving "significant weight to an improper factor" and in weighing other factors. Each of the factors discussed by the court was accounted for in the guideline range, which range was aggravated to accommodate both the *use* of the firearm to retaliate (in self-defense) against armed assailants and the *type* of firearm used. Those reasons are therefore insufficient to justify the dramatic upward variance. The aggregate sentence (for the grouped firearms counts and the revocation) was procedurally and substantively unreasonable; this court should vacate and remand for resentencing.

**III.    Sections 922(g)(1) and 922(o) violate the Second Amendment facially and as applied to Mr. Shelton.**

**Standard of review:** This Court exercises plenary review over a challenge to a statute's constitutionality. *See Binderup v. Att'y Gen.*, 836 F.3d 336, 341 (3d Cir. 2016) (en banc).

**Introduction**

The Second Amendment's "plain text" protects the right of "the people" to "keep and bear Arms." U.S. Const. Amend. II. Section 922(g)(1), however, disarms *permanently* "any person" who "has been convicted in any court" of "a crime punishable by imprisonment for a term exceeding one year." 18 U.S.C. § 922(g)(1). And section 922(o) makes it "unlawful for any person to transfer or possess a machinegun."

"[W]hen the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct." *New York State Rifle & Pistol Ass'n, Inc. v. Bruen*, 597 U.S. 1, 17 (2022). To justify a firearm regulation, "the government must demonstrate that the regulation is consistent with this Nation's historical tradition of firearm regulation." *Bruen*, 597 U.S. at 17; *see United States v. Rahimi*, 144 S. Ct. 1889 (2024).

The government bears the burden of establishing the constitutionality of § 922(g)(1) by identifying well-established historical

analogues and, to date, has not offered a single historical regulation that is relevantly similar to § 922(g)(1)'s categorical lifetime ban on persons with prior convictions for a crime punishable by more than one year, let alone a historical tradition of such a categorical ban. Put simply, "there are no examples of founding, antebellum, or Reconstruction-era federal laws like 18 U.S.C. § 922(g)(1) permanently disarming non-capital criminals." *Range v. Att'y Gen.*, 69 F.4th 96, 106 (3d Cir. 2023) (Porter, J., concurring). Thus, § 922(g)(1) is facially unconstitutional because it violates the Second Amendment in all its applications. *Rahimi,* 144 S. Ct. at 1898. The statute is also unconstitutional as applied to Mr. Shelton.

Criminalizing gun possession pursuant to 18 U.S.C. § 922(o) is also unconstitutional as applied to Mr. Shelton, who possessed a handgun affixed with a Lego sized machine gun conversion device, because it criminalizes possession of firearms "in common use" for the purpose of self-defense. Further, the statute is inconsistent with the Nation's historical tradition of firearms restrictions.

**Discussion**

The Second Amendment's operative clause contains only three elements, guaranteeing the right (1) "of the people," (2) "to keep and bear," (3) "arms." *District of Columbia v. Heller,* 554 U.S. 570, 579-95 (2008). Mr. Shelton is part of "the people" and his conduct—possessing ammunition and a handgun equipped with a machine gun conversion device—falls squarely within the Second Amendment's plain text and is protected. *See Bruen*, 597 U.S. at 17-18 (holding that when "the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct," and the government must establish its regulation "is consistent with the Nation's historical tradition of firearms regulation").

In *Bruen*, the Court struck down a New York law providing that, to obtain a permit to carry a concealed handgun in public, an applicant had to demonstrate "proper cause," *i.e.*, "a special need for self-protection distinguishable from that of the general community." *Bruen*, 597 U.S. at 12. At step one, the Court noted it was "undisputed" that the petitioners were "part of 'the people' whom the Second Amendment protects," and that handguns are "Arms" for Second Amendment

purposes. *Id.*, 31-32. The Court also "ha[d] little difficulty concluding" that the petitioners' "proposed course of conduct—carrying handguns publicly for self-defense"—qualifies as "bear[ing] arms." *Id.*, 32. The Second Amendment therefore "presumptively guarantee[d]" a right to carry firearms in public, and New York's proper-cause requirement, which infringed on that right, could pass constitutional muster only if the state overcame that presumption. *Id.*, 33-34.

In *Rahimi*, the Supreme Court did not question or analyze whether Mr. Rahimi was among "the people" protected by the Second Amendment. Mr. Rahimi, despite his well-documented history of violence and misuse of firearms, still ranked among "the people" whose conduct, possession of a firearm, was protected. The Court proceeded directly to *Bruen's* step two and considered whether the statute disarming him was consistent with the Nation's historic tradition of firearm regulation. *Rahimi*, 144 S. Ct. at 1894.

Here, too, Mr. Shelton is among "the people,"[11] and his conduct, possessing ammunition and a handgun equipped with a machine gun

---

[11] Nothing in *Rahimi* calls into question the *Range* Court's holding that "'the people' as used throughout the Constitution, 'unambiguously refers to all members of the political community, not an unspecified

conversion device transforming that firearm into a machinegun, is

protected. *See Heller*, 554 U.S. at 581-82 (defining "keep" as "to retain;

not to lose," "to have in custody," and "to hold; to retain in one's power

or possession"); *Bruen*, 597 U.S. at 32 (defining "bear" as to "wear" or

"carry" firearms "upon the person or in the clothing or in a pocket").

Because the Second Amendment's plain text covers Mr. Shelton

and the conduct barred by Sections 922(g)(1) and 922(o), the

"Constitution presumptively protects that conduct." *Bruen*, 142 S. Ct. at

2130. The government has the burden to "affirmatively prove" that

Sections 922(g)(1) and 922(o) "as applied to [Mr. Shelton], '[are] part of

the historical tradition that delimits the outer bounds of the right to

keep and bear arms.'" *Range*, 69 F.4th at 101, 103 (quoting *Bruen*, 142

S. Ct. at 2127). The government has not done so.

Section 922(o) makes it "unlawful for any person to transfer or

possess a machinegun." and incorporates the definition of "machinegun"

set forth in section 5845(b) of the National Firearms Act

> [A machinegun is] any weapon which shoots, is designed to
> shoot, or can be readily restored to shoot, automatically more

---

subset.' [] So the Second Amendment right… presumptively 'belongs to
all Americans.'" *Range*, 69 F.4th at 101-02 & nn.1-4 (quoting *Heller*, 554
U.S. at 580-81).

than one shot, without manual reloading, by a single
function of the trigger. The term shall also include the frame
or receiver of any such weapon, any part designed and
intended solely and exclusively, or combination of parts
designed and intended, for use in converting a weapon into a
machinegun, and any combination of parts from which a
machinegun can be assembled if such parts are in the
possession or under the control of a person.

26 U.S.C. § 5845(b). At issue here is a Glock handgun fitted with an

auto sear or "Glock switch," a Lego-brick sized device that can be easily

fitted onto the back of a handgun's slide mechanism and, once attached

and enabled, turns a semiautomatic Glock into a fully automatic

firearm. Appx424, 432-33, 792.

Heller confirmed that the right the Second Amendment protects is

an individual right that includes "us[ing] arms in defense of hearth and

home." Heller, 554 U.S. at 635. The word "arms" in the Second

Amendment includes both "armour of defence" and "weapons of offence."

Id. at 581. Since the founding of this country, "arms" has included "all

firearms" that a person can "bear." Id. ("The 18th-century meaning is no

different from the meaning today."). Further, the Second Amendment

presumptively protects "all instruments that constitute bearable arms,

even those that were not in existence at the time of the founding." Id. at

582; see also Caetano v. Massachusetts, 577 U.S. 411, 412 (2016)

(holding stun guns to be protected arms). While the "Second Amendment's definition of 'arms' is fixed according to its historical understanding, that general definition covers modern instruments that facilitate armed self defense" - including machineguns. *Bruen*, 597 U.S. at 28. Thus, the plain language of the Second Amendment covers machineguns under the first step of the *Bruen* test (plain text), meaning that § 922(o) is presumptively unconstitutional.

Turning to the second step of the *Bruen* test, whether banning machinegun possession is consistent with our Nation's historical traditions in regulating guns, *Bruen* makes clear that the focus of the analysis on the type of "arms" at issue lies in whether they are commonly possessed for self-defense:

> [W]e explained there that the Second Amendment protects only the carrying of weapons that are those "in common use at the time," as opposed to those that "are highly unusual in society at large...." Whatever the likelihood that handguns were considered "dangerous and unusual" during the colonial period, they are indisputably in "common use" for self-defense today. They are, in fact, "the quintessential self-defense weapon.. . ." Thus, even if these colonial laws prohibited the carrying of handguns because they were considered "dangerous and unusual weapons" in the 1690s, they provide no justification for laws restricting the public carry of weapons that are unquestionably in common use today.

57

*Bruen*, 597 U.S. at 47. Clearly such weapons cannot be used to terrorize people, but banning the possession of commonly used "arms" does not comply with the dictates of the Second Amendment. *Id.* (recognizing that laws limiting gun possession in effect at the time of the Second Amendment's passage "merely codified the existing common-law offense of bearing arms to terrorize the people."). The carrying of weapons to have at the ready for self-defense is at the crux of the historical right to bear arms:

> The historical evidence from antebellum America does demonstrate that the manner of public carry was subject to reasonable regulation. Under the common law, individuals could not carry deadly weapons in a manner likely to terrorize others. Similarly, although surety statutes did not directly restrict public carry, they did provide financial incentives for responsible arms carrying. Finally, States could lawfully eliminate one kind of public carry - concealed carry - so long as they left open the option to carry openly.").

*Id.* at 59 (emphasis in original).

Machine guns are unquestionably in common use today for the purposes of self-defense. As of either 2015 or 2016, the Bureau of Alcohol, Tobacco, Firearms and Explosives ("ATF") had just under 500,000 legally registered machine guns in its database. *See* Ltr. from Stephanie M. Boucher, ATF Chief, Disclosure Div. to Jeffrey E. Folloder

58

(Feb. 24, 2016). As of April 2020, there were more than 726,000 machineguns lawfully possessed in the United States and registered with the ATF. U.S. Dep't of Justice, ATF, *Firearms Commerce in the United States: Annual Statistical Update 2020*, 15-16 (2021). As of May 2021, that number had increased to more than 740,000 machineguns lawfully possessed and registered in the United States. U.S. Dep't of Justice, ATF, *Firearms Commerce in the United States: Annual Statistical Update 2021*, 15-16 (2021). These figures demonstrate that the legal market for machineguns in the United States has not only remained robust since Congress began regulating their possession in the mid-1930's, but has in fact grown by more than 150% in the three decades since Congress enacted a purported ban on the possession of machine guns.

The number of lawfully possessed machineguns is almost quadruple the number of lawfully possessed stun guns that Justice Alito found sufficient to characterize that weapon as "widely owned and accepted as a legitimate means of self-defense." *Caetano*, 577 U.S. at 420 (Alito, J., concurring); *see also Maloney v. Singas*, 351 F. Supp. 3d 222, 237-38 (E.D.N.Y. 2018) (finding evidence that the 64,890 nunchaku

59

sold on the retail market in the United States between 1995 and 2018 were sufficient to show the weapon was "in common use"); *Avitabile v. Beach*, 368 F. Supp. 3d 404, 411-12 (N.D.N.Y. 2019) (finding evidence that at least 300,000 tasers were owned by private citizens in the United States sufficient to show the weapon was "in common use").

These figures also only include lawfully owned firearms that were grandfathered in from before the passage of § 922(o) in 1986. *See* 18 U.S.C. § 922(o)(2)(B); Firearm Owner's Protection Act, Pub. L. No. 99-308, 100 Stat 449, sec. 102 (May 19, 1986). The actual number of machine guns currently owned by Americans is undoubtedly significantly higher. Even unlawfully owned machine guns count for the purposes of assessing whether it is in "common use." *Cf. Friedman v. City of Highland Park*, 784 F.3d 406, 409 (7th Cir. 2015) (explaining "it would be absurd to say that the reason why a particular weapon can be banned is that there is a statute banning it, so that it isn't commonly owned."). Thus, as set forth above, section 922(o) is unconstitutional both facially and as applied to Mr. Shelton.

Recently, the federal district court for the district of Kansas came to this same conclusion. *See United States v. Morgan,* No. 23-10047,

2024 WL 3936767, at *5 (D.Kan., Aug. 26, 2024). There, the defendant was charged with possession of two machine guns, one of which was like Mr. Shelton's—it had a conversion switch attached. *Id.*, *1. Finding the defendant's conduct presumptively protected by the Constitution, *id.*, *2-3, the court turned to *Bruen's* second step to see if the government could justify its regulation by demonstrating that it is consistent with the Nation's historical tradition of firearm regulation. *Id.*, *3.

To meet its burden, the government advanced two potential historical analogs. *Id.* First, the government relied on English common law, asserting that it prohibited riding or going armed with dangerous or usual weapons. *Id.* (citations omitted). Second, the government cited an 1824 North Carolina Supreme Court case that recognized an offense to arm oneself "with dangerous and unusual weapons, in such a manner as will naturally cause a terror to the people." *Id.* (quoting *State v. Langford*, 3 Hawks 381, 383 (N.C. 1824)). But the court found both examples to be poor analogues for simple possession of a machinegun. *Id.*

The court noted that *Bruen* had addressed the government's first example because it had observed that Blackstone's reference to English

61

laws concerning going armed with dangerous and unusual weapons derived from the Statute of Northampton - at least as it was understood during the Middle Ages - but had little bearing on the Second Amendment adopted in 1791." *Id.* (quoting *Bruen*, 597 U.S. at 4). It was focused, for the most part, on conduct that evinced an intent to breach the peace, and, in any event, was predicated on the manner in which arms were carried or displayed. *Id.*

In the government's second example, it asserted that "[i]n the United States, too, courts long ago acknowledged that a man commits 'an offence at common law' when he 'arms himself with dangerous and unusual weapons, in such a manner as will naturally cause a terror to the people.'" *Id.*, *4. (quoting *State v. Langford*, 10 N.C. 381, 383 (1824)). The court once again noted that the Supreme Court had addressed this category of laws at some length in both *Bruen* and *Rahimi*, describing them as prohibitions against "going armed" or "affray," the latter word being a term derived from a French word meaning "to terrify." *Id.* (quoting *Rahimi*, 144 S. Ct. at 1900-01; *Bruen*, 597 U.S. at 46). The *Morgan* court explained that the Court understood these laws to combine the elements of going about in a manner to

62

terrorize the public with dangerous and unusual weapons.

*Id.* (citing *Rahimi*, 144 S. Ct. 1900-01; *Bruen*, 597 U.S. at 46-50).

Contrasting § 922(o) with these examples, the court found they said nothing about the manner in which machineguns are carried or displayed because the statute criminalizes mere possession of such weapons without regard to how the possessor uses them. *Id.* The court reasoned that "if an individual purchases such a weapon and locks it away in a gun safe in his basement for twenty years without touching it, he is just as guilty of a violation of § 922(o) as one who takes the same weapon out on the public streets and displays it in an aggressive manner." *Id.*

Such reasoning applies equally here.

**This Court's intervening authority**

Recently, in *United States v. Moore*, 111 F.4th 266 (3d Cir. Aug. 2, 2024), *petition for rehearing denied* Oct. 9, 2024, this Court rejected a Second Amendment challenge to § 922(g)(1) because the appellant in that case was on supervised release at the time of his § 922(g)(1) offense. The Court concluded that "history and tradition support disarming convicts who are completing their sentences." *Id.,* 273. Mr.

Shelton was on supervised release at the time of his § 922(g)(1) and § 922(o) offenses. *See* Appx322, 446. Mr. Shelton recognizes that *Moore,* if it stands, forecloses his Second Amendment challenge to 922(g)(1), but he continues to press these arguments for further review. And *Moore's* holding would appear to apply equally to § 922(o), that is, if the Court is correct that history and tradition support disarming those who are serving a supervised release sentence, that is true whether the supervisee possesses a handgun or a handgun equipped with a machine gun conversion device.

For preservation purposes, Mr. Shelton contends that *Moore* was wrongly decided for at least two reasons. First, by holding that § 922(g)(1) is constitutional as applied to an individual who is on supervised release, the Court effectively rewrote § 922(g)(1) to add a supervised-release element that appears nowhere in the statute. *See Ayotte v. Planned Parenthood,* 546 U.S. 320, 329-30 (2006) (refusing to "rewrit[e] [the] law to conform it to constitutional requirements" and thereby "substitut[e] the judicial for the legislative department of the government"). That was error: the question in an as-applied challenge like this one is not whether the indicted individual can constitutionally

64

be disarmed for any reason, it is whether the charged statute can be enforced against that individual. *See Los Angeles v. Patel*, 576 U.S. 409, 418 (2015) (explaining in the context of a facial challenge that an "application" of a statute is one in which the statute "actually authorizes or prohibits conduct"). If statute by its text violates the Second Amendment, it does not "become constitutional" simply because facts irrelevant to the statute suggest the person or conduct at issue "could have been regulated, had the legislature seen fit to do so." *People v. Burns*, 79 N.E.3d 159, 165-66 (Ill. 2015).

Second, the *Moore* Panel's historical analysis is inconsistent with *Bruen* and *Rahimi*. The smattering of historical forfeiture laws on which it relied are not proper analogues for barring firearm possession during a sentence of supervised release or parole. Most of the identified laws were not firearm regulations at all; they deprived individuals of their entire estates upon conviction for an assortment of specified crimes. *Rahimi*, 144 S. Ct. at 1900 (emphasizing that the historical analogues "targeted the misuse of firearms"). Critically, none of the laws involved a continuing prohibition on possessing new personal property—including firearms—after the initial forfeiture. *See Range*, 69

65

F.4th at 105. The two firearm-specific forfeiture laws identified targeted

past *misuse of a* firearm or an identifiable threat to the government and

are not proper analogues here. To the extent there is any historical

analogue for supervised release, the "nearest" founding-era practice was

judge-imposed recognizances on convicted individuals that "made their

continued liberty contingent on good behavior." *United States v.*

*Haymond*, 588 U.S. 634, 677 (2019) (Alito, J., dissenting). Recognizance

conditions imposed on convicted individuals generally did not prohibit

the mere possession of firearms. *See, e.g., Republica v. Cobbett,* 3 U.S.

467, 475 (1798); 4 William Blackstone, Commentaries on the Laws of

England 248 (1st ed. 1769). The founding-era practice of recognizances

thus indicates that disarming individuals on supervised release (like

parole) is inconsistent with this Nation's history.

Accordingly, Mr. Shelton maintains that § 922(g)(1) and 922(o)

violate the Second Amendment on their face and as applied to him.

## CONCLUSION

For the foregoing reasons, 18 U.S.C. §§ 922(g)(1) and 922(o)

violate the Second Amendment; the convictions should be vacated.

Alternatively, the judgment should be vacated, and the case remanded

for resentencing.

Respectfully submitted,

**_/s/ Renee Pietropaolo_**
Renee Pietropaolo
Assistant Federal Public Defender

Counsel for Appellant
Oronde Shelton

## CERTIFICATE OF BAR MEMBERSHIP

It is hereby certified that Renee Pietropaolo is a member of the bar of the Court of Appeals for the Third Circuit.

_/s/ Renee Pietropaolo_
Renee Pietropaolo
Assistant Federal Public Defender

November 22, 2024

# CERTIFICATE OF COMPLIANCE

I, Renee Pietropaolo, Assistant Federal Public Defender, hereby certify the following:

1.      This brief complies the type-volume limitation of Federal Rule of Appellate Procedure 32(a)(7)(B)(i) because it contains 12,623 words excluding the parts of the brief exempted by Fed. Rule App. P. 32(f).

2.      This brief complies with the typeface and type-style requirements of Federal Rules of Appellate Procedure 32(a)(5) and (a)(6) because it has been prepared in a proportionally spaced typeface using Word 365 in font size 14, type style Century Schoolbook.

3.      This brief complies with 3d Circuit L.A.R. 31.1 (2011) because the text of the electronic brief is identical to the text in the paper copies. Further, the electronic version of the attached brief was automatically scanned by Trend Micro anti-virus software version 14.0 and found to contain no known viruses.

*/s/ Renee Pietropaolo*
Renee Pietropaolo
Assistant Federal Public Defender

November 22, 2024

# CERTIFICATE OF SERVICE

I, Renee Pietropaolo, Assistant Federal Public Defender, hereby certify that I have electronically filed the Opening Brief for Appellant and Appendix and served copies upon Filing User Adam Hallowell, Assistant United States Attorney, through the Third Circuit Court of Appeals' Electronic Case Filing (CM/ECF) system.

*/s/ Renee Pietropaolo*
Renee Pietropaolo
Assistant Federal Public Defender

November 22, 2024