IN THE UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

---

Nos. 24-1302, 24-1322, 24-1491

---

UNITED STATES OF AMERICA,
Appellee/Cross-Appellant

v.

ORONDE SHELTON,
Appellant/Cross-Appellee

---

Appeal from a judgment entered
in the United States District Court for the Western
District of Pennsylvania at
Nos. 2:21-cr-00216, 2:09-cr-00232

---

RESPONSE AND REPLY BRIEF FOR
APPELLANT/CROSS-APPELLEE

---

ELISA A. LONG
Federal Public Defender

RENEE PIETROPAOLO
Assistant Federal Public Defender

Federal Public Defender
Western District of Pennsylvania
1001 Liberty Avenue, Suite 1500
Pittsburgh, PA  15222
(412) 644-6565

# TABLE OF CONTENTS

Table of Authorities ................................................................. v

Table of Abbreviations ............................................................ xi

Statement of the Issues ........................................................... 1

Supplemental Statement of Related Cases and Proceedings ................... 2

Summary of the Argument ....................................................... 3

Argument .............................................................................. 5

*Argument in Response for Oronde Shelton as Cross-Appellee* ................. 5

I.   Mr. Shelton's Pennsylvania drug convictions are not "serious drug offenses" under the ACCA because state law defines the cocaine family of substances more broadly than the federal Controlled Substances Act, making the state offense categorically broader than its federal counterpart. .......................................... 5

    A.   An intervening Supreme Court opinion impacts the district court's ruling. ....................................................... 6

    B.   The categorical approach applies. ........................................ 8

    C.   Pennsylvania defines the cocaine family of substances more broadly than its federal counterpart: Pennsylvania law criminalizes *all* of cocaine's isomers while federal law criminalizes only optical and geometric isomers. ............................................................... 10

        1.   Pennsylvania criminalizes any "derivative" of cocaine, a broad category that includes *all* isomers of cocaine. ......................................................... 10

        2.   Federal law criminalizes only optical and geometric isomers. ......................................................... 16

3.    The Pennsylvania statute sweeps more broadly than its federal counterpart by criminalizing *all* of cocaine's isomers while federal law criminalizes only optical and geometric isomers.........17

4.    Multiple courts of appeals have recognized that state laws criminalizing all isomers of cocaine are broader than federal law, which criminalizes only cocaine's "optical" and "geometric" isomers.................19

D.    The realistic probability test has no role to play.................24

E.    Pennsylvania's definition of cocaine-related substances, which includes derivatives of coca leaves, sweeps in ioflupane, a substance the parties agree is a derivative of cocaine.............................26

1.    This Court has no power to issue an advisory opinion deciding whether a post-2015 Pennsylvania cocaine conviction is a "serious drug offense.".........................26

2.    Pennsylvania's definition of cocaine-related substances includes ioflupane. .........................28

*Argument in Reply for Oronde Shelton as Appellant*.............................35

I.    The district court erred by applying a four-level enhancement for use of a firearm "in connection with another felony offense" because Mr. Shelton was justified in instinctively returning fire at assailants who ambushed and shot at him.............................35

A.    The Guideline miscalculation is not moot.............................36

B.    It was undisputed that Mr. Shelton's momentary retaliatory use of force when confronted while on foot by a fast-approaching armed drive-by shooter was justified. .........................39

II.   By basing its upward variance to the statutory
      maximum for the firearms possession and its consecutive top-of-
      the-revocation-range sentence for the supervised
      release violation on improper factors and factors fully
      captured by the guidelines, the district court imposed a
      procedurally and substantively unreasonable sentence ............... 54

III.  Sections 922(g)(1) and 922(o) violate the Second
      Amendment facially and as applied to Mr. Shelton ...................... 55

Conclusion ................................................................................. 56

Certificate of Bar Membership

Certificate of Compliance

Certificate of Service

# TABLE OF AUTHORITIES

**Cases:**

*A. Kemp Fisheries, Inc. v. Castle & Cooke, Inc., Bumble Bee Seafoods Div.,* 852 F.2d 493 (9th Cir. 1988) ................................ 40, 53

*Berardi v. Swanson Mem. Lodge No. 48 of the Fraternal Order of Police*, 920 F.2d 198 (3d Cir. 1990) .......................... 39, 40

*Brown v. United States*, 602 U.S. 101 (2024) ........................ 1, 7, 9, 26, 35

*Burgess v. United States*, 553 U.S. 124 (2008) ....................................... 22

*Cabeda v. Att'y Gen.*, 971 F.3d 165 (3d Cir. 2020) .................................. 24

*Commonwealth v. Bartlow*, 2015 WL 7453348 (Pa. Super. 2015) ......... 50

*Commonwealth v. Hawkins*, 2014 WL 10986149 (Pa. Super. 2014) ...................................................................... 50, 51

*Commonwealth v. Highsmith*, 2017 WL 2312344 (Pa. Super. 2017) ................................................................... 49

*Commonwealth v. Isaacman*, 409 A.2d 880 (Pa. Super. 1979) .............. 50

*Commonwealth v. Johnson*, 245 A.3d 1049 (Pa. Super. 2020) ......... 50, 51

*Commonwealth v. Murray*, 260 A.3d 161 (Pa. Super. 2021) .................. 51

*Commonwealth v. Rivera*, 983 A.2d 1211 (Pa. 2009) ............................ 49

*Commonwealth v.* Santiago, 340 A.2d 440 (Pa. 1975) .......................... 15

*Commonwealth v. Slyman*, 483 A.2d 519 (Pa. Super. 1984) ................................ 13, 14, 15, 16, 18, 23

*Commonwealth v. Torres*, 766 A.2d 342 (Pa. 2001) ................................ 51

v

*Commonwealth v. Walley*, 353 A.2d 396 (Pa. 1976) ............................... 50

*Commonwealth v. Wansley*, 2013 WL 11248586
(Pa. Super. 2013) ................................................................ 52

*Erlinger v. United States*, 602 U.S. 821 (2024) ...................................... 37

*Esteras v. United States*, 606 U.S. __, 2025 WL 1716137
(U.S. June 20, 2025) ........................................................... 17

*Felix v. Gov't V.I.*, 702 F.2d 54 (3d Cir. 1983) ......................................... 6

*Harvey v. Plains Twp. Police Dep't*, 421 F.3d 185 (3d Cir. 2005) .......... 28

*Jean-Louis v. Att'y Gen.*, 582 F.3d 462 (3d Cir. 2009) ........................... 24

*Jimenez v. State*, 352 So.3d 1286 (Fla. 2d DCA 2023) .......................... 53

*Martinez v. Att'y Gen.,* 906 F.3d 281 (3d Cir. 2018) ............................... 33

*Mathis v. United States*, 579 U.S. 500 (2016) .................................... 8, 25

*Mellouli v. Lynch,* 575 U.S. 798 (2015) ................................................. 25

*Ndungu v. Att'y Gen.*, 126 F.4th 150 (3d Cir. 2025) ............................... 24

*Pepper v. United States*, 562 U.S. 476 (2011) ........................................ 37

*Preiser v. Newkirk*, 422 U.S. 395 (1975) ............................................... 27

*Rosenberg v. DVI Receivables XVII, LLC*, 835 F.3d 414
(3d Cir. 2016) .................................................................... 40

*Salmoran v. Att'y Gen.*, 909 F.3d 73 (3d Cir. 2018) .......................... 24, 35

*Shular v. United States*, 589 U.S. 154 (2020) ...................................... 8, 9

*Sosa v. Alvarez-Machain*, 542 U.S. 692 (2004) ....................................... 23

*United States v. Bell*, 2024 WL 1892283
   (M.D.Pa., Apr. 30, 2024) ................................................................... 13

*United States v. Boyce*, 2022 WL 2159890 (S.D.N.Y. 2022)............. 15, 18

*United States v. Brown*, 47 F.4th 147 (3d Cir. 2022) ................... 1, 7, 8, 9

*United States v. Brown*, 764 F.Supp.3d 456
   (S.D.Miss., Jan. 29, 2025)................................................................. 56

*United States v. Cogdill*, 130 F.4th 523 (6th Cir. 2025) ......................... 37

*United States v. De La Torre*, 940 F.3d 938 (7th Cir. 2019) ................. 10

*United States v. Eddington*, 65 F.4th 1231 (10th Cir. 2023)................. 43

*United States v. Fisher*, 420 A.2d 427 (Pa. 1980) ................................... 43

*United States v. Holmes*, 2022 WL 1036631 (E.D.N.Y. 2022)............... 18

*United States v. Jones*, 332 F.3d 688 (3d Cir. 2003)................................. 5

*United States v. Lianidis*, 599 F.3d 273 (3d Cir. 2010) .................... 39, 53

*United States v. Minter,* 80 F.4th 406
   (2d Cir. 2023) ........................................ 9, 18, 20, 21, 22, 24

*United States v. Moore*, 111 F.4th 266 (3d Cir. 2024), *certiorari denied*,
   S. Ct. No. 24-96 (June 30, 2025) ..................................................... 56

*United States v. Myers*, 56 F.4th 595 (8th Cir. 2022)....................... 20, 22

*United States v. Oliver*, 987 F.3d 794 (8th Cir. 2021) .............................. 9

*United States v. Owen*, 51 F.4th 292 (8th Cir. 2022) ............... 6, 9, 11, 20

*United States v. Phifer*, 909 F.3d 372 (11th Cir. 2018) .......................... 11

*United States v. Ruth*, 966 F.3d 642 (7th Cir. 2020) ............................. 20

*United States v. Santana*, ___ F.4th ___, 2025 WL 1739593
   (7th Cir. 2025) .................................................................... 39

*United States v. Singh*, 783 F.App'x 191 (3d Cir. 2019) .......................... 9

*United States v. Taylor*, 596 U.S. 845 (2022) ........................................ 25

*United States v. Wilkes,* 78 F.4th 272 (6th Cir. 2023) ............................ 20

*Zhi Fei Liao v. Att'y Gen.*, 910 F.3d 714 (3d Cir 2018) .......................... 24

## Constitution, Statutes, and Regulations:

U.S. Const. Amend. II ....................................................................... 56, 57

18 Pa. C.S. § 505(b)(2) .......................................................................... 43

18 Pa. C.S. § 505(b)(2.3) ....................................................................... 52

35 P.S. § 780-102 ................................................................................... 19

35 P.S. § 780-104 ................................................................................... 19

35 P.S. § 780-104 (2)(i)(4) .................................................. 12, 13, 28, 29

35 P.S. § 780-104 (2)(iii)(1) (1972)........................................................ 23

35 P.S. § 780-104 (ii) ............................................................................ 23

35 P.S. 780-104, Sch. II (ix) (1999) ....................................................... 23

35 P.S. 780-104, Sch. III (viii) (1999)..................................................... 23

18 U.S.C. § 922(g) ........................................................ 41, 56, 36

18 U.S.C. § 922(g)(1) .................................................... 41, 56, 57

18 U.S.C. § 922(o) ............................................................ 56, 57

18 U.S.C. § 924(e) .............................................................. 8, 38

21 C.F.R. § 182.20 ................................................................. 29

21 C.F.R. § 1300.01(b) .......................................................... 17

21 C.F.R. § 1308.11(d) .......................................................... 17

21 C.F.R. § 1308.12, Schedule II (eff. Dec. 10, 2007 to
    Sept. 10, 2015) ................................................................ 33

21 C.F.R. § 802 .................................................................... 8

21 U.S.C. § 802(14) ............................................................. 17

21 U.S.C. 812, Sch. II(a)(4) ................................................. 16

21 U.S.C. 812(c) ................................................................. 32

21 U.S.C. 812(c), Schedule II, (a)(4) (1976) ........................... 15

19 MO ADC 30-1.002(1)(B)(1)(D) ........................................ 22

MN St § 152.01 Subd. 3a. ................................................... 22

Neb. Rev. Stat. § 28-405 ..................................................... 22

NY Penal § 220.00(7) .......................................................... 22

Va. Code § 54.1-3448 .......................................................... 22

## Rules

Fed.R.App.P. 10(a) ........................................................................ 31

Fed.R.Evid. 201(b) ...................................................................... 31

## Sentencing Guidelines

U.S.S.G. § 2K2.1(b)(6) ............................................................ 3, 57

U.S.S.G. § 2K2.1(b)(6)(B) ...................................................... 3, 35

## Other Authorities

Merriam-Webster Dictionary, https://www.merriam-webster.com/dictionary/derivative .................................................... 12, 30

F. Ivy Carroll et al., Cocaine Receptor: Biochemical
    Characterization and Structure-Activity Relationships of
    Cocaine Analogues at the Dopamine Transporter, 35 J. of
    Medicinal Chemistry 969 (1992) ......................................... 18

Robert L. Clarke & Sol J. Daum, ß-Cocaine, 18 J. of Medicinal
    Chemistry 102 (1975) ........................................................ 18

Ernest L. Eliel et. al., Stereochemistry of Organic Compounds
    1021 (1994) ...................................................................... 11

Milton Orchin et al., The Vocabulary and Concepts of Organic
    Chemistry (2d ed. 2005) ............................................... 11, 20

# TABLE OF ABBREVIATIONS

| | |
|---|---|
| Step-One Br. | Refers to Appellant/Cross-Appellee Oronde Shelton's Opening Brief at Nos. 24-1302 and 24-1322 |
| Step-Two Br. | Refers to Appellee/Cross-Appellant United States' Opening Brief at No. 24-1491 and Responsive Brief as to the Step-One Brief |
| Step-Three Br. | Refers to Appellant/Cross-Appellee Shelton's Responsive Brief as to the Government's Step-Two Brief and Reply as to his own issues in Nos. 24-1302 and 24-1322 |

# STATEMENT OF THE ISSUES

*For Mr. Shelton as Cross-Appellee*

**I.    Did the district court correctly determine Mr. Shelton's Pennsylvania drug convictions are not "serious drug offenses" because state law criminalizes substances the federal Controlled Substances Act does not?**

**Preservation and Ruling:**

Mr. Shelton objected to application of the Armed Career Criminal Act, arguing that his more than three-decades old drug convictions were not "serious drug offenses" because Pennsylvania's controlled substances schedule includes substances its federal counterpart does not. *See generally* Appx189 (defense arguing "the Pennsylvania range of substances is broader than" its federal counterpart); Appx198, 200 & 201 (defense arguing the Pennsylvania statute is broader "at least" because of ioflupane's removal from the federal schedules and explaining Pennsylvania's statute sweeps in "any" derivative of cocaine). The district court agreed. *See* Appx779-88. In relevant part, the Court ruled that at the time of Mr. Shelton's 2021 firearm offense, the Pennsylvania drug statute swept more broadly than its federal counterpart because Pennsylvania criminalizes ioflupane but the federal Controlled Substance Schedule has excluded ioflupane since September 2015. Appx782-83. The court identified then-binding precedent holding that when determining whether the state and federal law are a categorical match, courts must "look to federal law in effect at the time of the commission of the federal offense." Appx785 (discussing *United States v. Brown*, 47 F.4th 147, 148 (3d Cir. 2022)).

In its cross-appeal, the government relies on an intervening Supreme Court decision to challenge the district court's ruling. Appx248. In *Brown v. United States*, 602 U.S. 101 (2024), the Supreme Court held that the state schedule must be compared with the federal schedule in effect at the time of the state offense, not the federal drug schedule in effect at the time of the federal offense. *Id.*, 1202, 1204. The government preserved this argument below. Appx248.

## SUPPLEMENTAL STATEMENT OF RELATED
## CASES AND PROCEEDINGS

Whether Pennsylvania defines cocaine to include more substances than the federal Controlled Substances Act, making the state drug offense categorically broader than its federal counterpart, *see* Part I.C., *infra,* is also pending in *United States v. Gamble*, 3d Cir. Nos. 23-2105 & 23-2199. *See* Principal Brief and Response Brief for Cross-Appellant / Appellee Michael Gamble, Document 69 (filed April 9, 2025).

## SUMMARY OF THE ARGUMENT

This Court should affirm the district court's ruling that Mr. Shelton's prior drug convictions do not qualify as "serious drug offenses" within the meaning of the Armed Career Criminal Act but remand for resentencing without U.S.S.G. § 2K2.1(b)(6)'s four-level enhancement.

Mr. Shelton's decades-old Pennsylvania drug convictions are not ACCA predicates because Pennsylvania defines cocaine more broadly than its federal counterpart. Pennsylvania's statute criminalizes *all* cocaine's isomers while federal law criminalizes only two—optical and geometric isomers. Because of this mismatch, Mr. Shelton's remote convictions are not "serious drug offenses" and cannot trigger ACCA's 15-year mandatory minimum. Thus, the district court's overbreadth ruling was correct, though for a different reason than identified below, and this Court may affirm on that basis.

This Court should nevertheless remand for resentencing because the district court wrongly applied 2K2.1(b)(6)(B). The government now concedes that Mr. Shelton's momentary retaliatory use of force during the March 17, 2021 ambush was justified and consequently cannot support the enhancement for use of a firearm in connection with

another felony offense. It instead points to a separate January 2021 incident, urging affirmance on that basis but that theory fails. First, the district court did not make any necessary predicate findings of fact, and this Court cannot make them in the first instance. Second, the argument fails on the merits because the record shows Mr. Shelton acted in justifiable self-defense. In January 2021, armed individuals in a car fired toward Mr. Shelton's sister's house as he approached on foot. Mr. Shelton offered unrebutted testimony that he only realized what had happened after a neighbor identified a car as the source of gunfire *while* that car was speeding toward him with a firearm displayed. Mr. Shelton fired his own weapon in self-defense, as an eye-witness corroborated. The government presented no evidence to rebut his claim of self-defense. Nor did it show that Mr. Shelton—on foot and vulnerable to armed assailants in a fast-approaching car—knew he could have retreated with complete safety.

Accordingly, this Court should affirm the district court's ACCA ruling and remand for resentencing without the 2K2.1 enhancement.

# ARGUMENT

*Argument in Response for Oronde Shelton as Cross-Appellee*

I.   **Mr. Shelton's Pennsylvania drug convictions are not "serious drug offenses" under the ACCA because state law defines the cocaine family of substances more broadly than the federal Controlled Substances Act, making the state offense categorically broader than its federal counterpart.**

**Standard of Review:** Whether a prior conviction qualifies as a "serious drug offense" under the ACCA is reviewed *de novo. United States v. Jones*, 332 F.3d 688, 690-91 (3d Cir. 2003).

Oronde Shelton's more than three-decade-old convictions for non-violent drug sales, occurring when he was just 18 years old, do not fall within the Armed Career Criminal Act's definition of "serious drug offense," as the district court correctly found. The district court ruled that Mr. Shelton's prior convictions were not "serious drug offenses" because Pennsylvania's definition of the cocaine family of substances is broader than the Controlled Substance Act's definition. *See* Appx779-88. Although the district court limited its analysis of the state statute's overbreadth to Pennsylvania's inclusion of ioflupane, a derivative of cocaine specifically excluded from the federal definition in 2015, its overbreadth determination remains correct. *See generally* Appx189, 198, 200 & 201 (wherein the defense explains that Pennsylvania's

statute sweeps in "any" derivative of cocaine and argues "the
Pennsylvania range of substances is broader than" its federal
counterpart "at least" because of ioflupane's removal).

"Cocaine has multiple isomers." *United States v. Owen*, 51 F.4th
292, 295 (8th Cir. 2022). Federal law criminalizes just two: optical and
geometric isomers. Pennsylvania's statute, by contrast, criminalizes
them all. Because Pennsylvania's statute therefore sweeps more
broadly than its federal counterpart, there remains a mismatch
between the Pennsylvania cocaine offense and the federal definition
under the Controlled Substances Act. *See Felix v. Gov't V.I.*, 702 F.2d
54, 57 (3d Cir. 1983) (appellate court may affirm the judgment on any
basis supported in the record). Pennsylvania's statute is categorically
broader than the federal statute, and Mr. Shelton's prior convictions are
not "serious drug offenses."

The district court's ruling should be affirmed.

## A.   An intervening Supreme Court opinion impacts the district court's ruling.

The district court ruled that Mr. Shelton's prior convictions were
not "serious drug offenses" because Pennsylvania's definition of the
cocaine family of substances is broader than the Controlled Substance

Act's definition. *See* Appx779-88. In relevant part, the Court ruled that at the time of Mr. Shelton's 2021 firearms offense, the Pennsylvania drug statute swept more broadly than its federal counterpart because Pennsylvania criminalizes ioflupane but the federal Controlled Substance Schedule has excluded ioflupane since September 2015. Appx782-83. The court identified then-binding precedent holding that when determining whether the state and federal law are a categorical match, courts must "look to federal law in effect at the time of the commission of the federal offense." Appx785 (discussing *United States v. Brown*, 47 F.4th 147, 148 (3d Cir. 2022)).

In *Brown v. United States*, 602 U.S. 101 (2024), the Supreme Court held that the state drug schedule must be compared with the federal schedule in effect at the time of the state offense, not the federal drug schedule in effect at the time of the federal offense. *Id.*, 111. At the time of Mr. Shelton's state offense (1992), ioflupane was on both the state and federal schedules; therefore, the Pennsylvania statute was not broader than the federal statute on that basis.

Nevertheless, and as will be explained, *see* Part I.C., *infra*, the district court's determination that Pennsylvania's definition of cocaine

7

is broader than the federal definition is correct, though for a different reason than that identified below.

B.    **The categorical approach applies.**

The Armed Career Criminal Act sets a fifteen year minimum sentence for any person who possesses a firearm as a felon and has "three previous convictions … for a violent felony or a serious drug offense, or both, committed on occasions different from one another…." 18 U.S.C. § 924(e). "ACCA defines 'serious drug offense' [in pertinent part] … as state offenses involving substances on the Federal Schedules of Controlled Substances, 21 U.S.C. § 802, that carry a term of imprisonment of ten years or more." *United States v. Brown*, 47 F.4th 147, 149 (3d Cir. 2022), *aff'd*, 602 U.S. 101 (2024).

To determine whether a prior state conviction qualifies as a "serious drug offense," federal sentencing courts employ the categorical approach. *See Shular v. United States*, 589 U.S. 154, 157 (2020). The categorical approach requires a sentencing court to compare the elements of the prior conviction to the federal category triggering enhanced sentencing consequences, here the definition of "serious drug offense." *Shular*, 589 U.S. at 159; *Mathis v. United States*, 579 U.S. 500,

8

504 (2016). A state drug offense counts as a serious drug offense "only if the State's definition of the drug in question 'matche[s]' the definition under federal law." *Brown v. United States*, 602 U.S. 101, 106 (2024) (quoting *Shular*, 489 U.S. at 158). If the state drug schedule encompasses controlled substances that are not included in the federal drug schedules, then the state offense is categorically overbroad and does not qualify as a serious drug offense. *See Brown,* 47 F.4th at 149-50, *affirmed by Brown v. United States,* 602 U.S. 101 (2024) (considering whether state statute, which criminalized all forms of the cannabis plant, was a match for the federal statute, which removed hemp from the CSA); *United States v. Singh*, 783 F.App'x 191, 194-95 (3d Cir. 2019) (New York's controlled substances act swept more broadly than the federal CSA because the state schedules included "chorionic gonadotropin" and federal law did not). Indeed, if the state drug statute "criminalizes ***even one additional isomer***" of a controlled substance that the federal Controlled Substances Act does not, it is not a "serious drug offense" for purposes of ACCA. *United States v. Owen*, 51 F.4th 292, 296 (8th Cir. 2022) (emphasis added) (citing *United States v. Oliver*, 987 F.3d 794, 806-07 (8th Cir. 2021)); *United States v. Minter*,

80 F.4th 406, 409 (2d Cir. 2023) ("A state's criminalization of a single substance not also prohibited by the CSA is often enough to prevent a prior conviction from triggering a federal sentencing enhancement."); *United States v. De La Torre*, 940 F.3d 938, 951 (7th Cir. 2019) ("Because the federal definition of methamphetamine includes only its optical isomers whereas the Indiana definition includes something more than just optical isomers of methamphetamine, the mismatch renders the Indiana statute overbroad.").

Applying the categorical approach here, Mr. Shelton's Pennsylvania convictions do not qualify as ACCA predicates because Pennsylvania defines cocaine to include isomers that are not controlled under federal law.

   C.   **Mr. Shelton's state drug offenses are not "serious drug offenses" under the ACCA because Pennsylvania defines the cocaine family of substances more broadly than its federal counterpart: Pennsylvania law criminalizes *all* of cocaine's isomers while federal law criminalizes only optical and geometric isomers.**

      1.   **Pennsylvania criminalizes any "derivative" of cocaine, a broad category that includes *all* isomers of cocaine.**

Isomers are chemical compounds or molecules that share the same molecular formula, that is, they contain the same numbers and types of

10

atoms but differ in how those atoms are arranged in space. *See* Ernest L. Eliel et. al., *Stereochemistry of Organic Compounds* 1021 (1994). Isomers are subdivided into two major types: (1) constitutional isomers, which include positional isomers, and (2) stereoisomers, which include optical and geometric isomers. Milton Orchin et al., *The Vocabulary and Concepts of Organic Chemistry* 229-32, 248 (2d ed. 2005). *See United States v. Phifer*, 909 F.3d 372, 377-78 (11th Cir. 2018) (elaborating on the two broad types of isomers: (1) stereoisomers—isomers in which the atoms are joined in the same order, but in a different spatial arrangement—and (2) constitutional isomers—isomers in which the atoms are connected in different ways).

"Cocaine has multiple isomers." *United States v. Owen*, 51 F.4th 292, 295 (8th Cir. 2022). Pennsylvania criminalizes **all** of them. Specifically, Pennsylvania's schedules of controlled substances, at the time of Mr. Shelton's prior offenses and through to the present, define cocaine-related substances as:

> (i)    Any of the following substances, of any quantity, except those narcotics specifically excepted or listed in other schedules, whether produced directly or indirectly by extraction from substances of vegetable origin, or independently by means of chemical synthesis, or by combination of extraction and chemical synthesis:

\*\*\*

> 1.  Coca leaves and any salt, compound, derivative, or preparation of coca leaves, and any salt, compound, derivative, or preparation thereof which is chemically equivalent or identical with any of these substances, but shall not include decocainized coca leaves or extracts of coca leaves, which extracts do not contain cocaine or ecgonine.

35 P.S. § 780-104(2)(i)(4).

The term "derivative" is broadly defined in chemistry to mean, "a chemical substance related structurally to another substance and theoretically derivable from it" or "a substance that can be made from another substance." *See* Merriam-Webster Dictionary, https://www.merriam-webster.com/dictionary/derivative (derivative). Thus, according to its plain text, Pennsylvania's definition of the cocaine family of substances broadly includes derivatives of coca leaves, that is, substances related structurally to the coca leaf and theoretically derivable from it, and substances that can be made from the coca leaf, whether produced directly or indirectly by extraction from substances of vegetable origin, or synthetically.

The Pennsylvania Superior Court has confirmed that the Pennsylvania legislature, by adopting this broad definition of cocaine, "intended to prohibit *all* varieties of cocaine" including those "that derived directly from coca leaves as well as th[ose] synthetically produced in the laboratory...." *Commonwealth v. Slyman*, 483 A.2d 519, 524-25 (Pa. Super. 1984). *See United States v. Bell*, 2024 WL 1892283, *8-*9 (M.D.Pa., Apr. 30, 2024) (discussing *Slyman* and acknowledging that Pennsylvania's drug statute for over 20 years has swept in *all* isomers of cocaine).

In *Slyman*, the defense argued that the Commonwealth's evidence was insufficient to support a conviction for a cocaine offense because laboratory testing did not prove beyond a reasonable doubt the substance involved was a Schedule II "controlled substance" as defined by 35 P.S. § 780-104(2)(i)(4). *Id.*, 483 A.2d at 523-24. According to the defense, the statute criminalized only that variety of cocaine that is derived *naturally* from coca leaves. *Id.*, 524. At that time, the parties agreed that there were multiple derivatives of coca leaves and that only one "variety," the "isomer" "L-cocaine," was *naturally* derived from coca

13

leaves; the remaining "varieties or isomers" were *synthetically* derived. *Id.*, 483 A.3d at 524.

The Court "rejected in its entirety" the defendant's theory that the Pennsylvania Act "only prohibits those isomers of cocaine which are the natural product of the coca leaf." *Slyman*, 483 A.2d at 528. Instead, the Court relied on the plain statutory text—"[a]ny of the following substances…whether produced directly or indirectly…., or independently by means of chemical synthesis"—to conclude that "the statute's prohibitory sweep is sufficiently wide so as to embrace those varieties [or isomers] of cocaine which are susceptible of synthetic derivation." *Id.*, 483 A.2d at 524-25.

The state court went on to explain that reading the text to criminalize *all isomers*, whether naturally or synthetically derived, also was consistent with the statute's purpose: Given "the broad aim of protecting citizens of this Commonwealth from the deleterious effects of certain harmful drugs," Pennsylvania's legislature "intended to prohibit all varieties of cocaine," that is, all isomers whether those isomers are "derived directly from coca leaves" or "synthetically." *Id.*, 483 A.2d at 524, 525, 528.

14

In so holding, the Pennsylvania Court acknowledged that it was
interpreting the Pennsylvania definition of cocaine more broadly than
its federal counterpart at that time: "We acknowledge that the positions
we take today... and ultimately the construction to be accorded to the
language of 35 P.S. § 780[-]104(2)(i), are at odds with those adopted by
certain federal circuit courts... [Those federal courts] have ruled that
cocaine will constitute a Schedule II controlled substance only so long as
it is capable of derivation from coca leaves," thereby endorsing what
was known as the "isomer defense." *Slyman*, 483 A.2d at 528 n.16
(discussing 21 U.S.C. 812(c), Schedule II(a)(4) (1976) (banning "[c]oca
leaves and any salt, compound, derivative, or preparation of coca
leaves...")). The *Slyman* Court stressed that Pennsylvania was free to
construe its own statutes differently, that is, more broadly, than federal
courts had interpreted similar language in the (since amended) federal
CSA. *Slyman*, 483 A.2d at 528 n.16. *See United States v. Boyce,* 2022
WL 2159890, *4 (S.D.N.Y. 2022) (explaining that New York's legislature
intended that its law reach all isomers to foreclose challenges raising
the "isomer defense"). *See generally Commonwealth v. Santiago*, 340
A.2d 440, 444 (Pa. 1975) (noting that when Pennsylvania adopted its

controlled substances act in 1972 it initially sought to mirror the federal CSA).

In sum, statutory text and authoritative case law make plain that Pennsylvania's drug statute broadly sweeps in "*all* varieties of cocaine," including "those isomers of cocaine" which are "synthetically produced in the laboratory[.]" *Slyman*, 483 A.2d at 524-25, 528.

### 2. Federal law criminalizes only optical and geometric isomers.

Unlike Pennsylvania law, federal law criminalizes only *certain* of cocaine's isomers. In 1984, Congress amended the federal CSA to expand its reach while preserving certain limits. *See* H.R. Rpt. 98-835 (June 12, 1984). Since that time, "[c]ocaine" is defined in Schedule II of the drug tables to reach only "optical and geometric isomers":

> **(4)** coca[3] leaves, except coca leaves and extracts of coca leaves from which cocaine, ecgonine, and derivatives of ecgonine or their salts have been removed; cocaine, its salts, optical and geometric isomers, and salts of isomers; ecgonine, its derivatives, their salts, isomers, and salts of isomers; or any compound, mixture, or preparation which contains any quantity of any of the substances referred to in this paragraph.

21 U.S.C. 812, Sch. II(a)(4). That limitation is underscored by the federal definition of "isomer," which includes only the "optical or

geometric" isomers of cocaine. 21 U.S.C. § 802(14). 21 C.F.R. § 1300.01(b).

Although the CSA includes only optical and geometric isomers in its definition of cocaine, it includes additional isomers in its definition of other drugs. For example, the CSA defines hallucinogens to include optical, *positional*, or geometric isomers. 21 C.F.R. § 1308.11(d); 21 U.S.C. § 802(14). The absence of "positional" isomers from cocaine's definition given its inclusion elsewhere shows Congress did not intend to include positional isomers in its definition of cocaine. *See Esteras v. United States*, 606 U.S. __, 2025 WL 1716137, at *6 (U.S. June 20, 2025) (discussing "*expressio unius est exlusio alterius*" canon of construction).

> **3.    The Pennsylvania statute sweeps more broadly than its federal counterpart by criminalizing *all* of cocaine's isomers while federal law criminalizes only optical and geometric isomers.**

As explained, the Pennsylvania legislature intended to capture *all* isomers of cocaine: "[I]t is readily apparent" from the text that Pennsylvania's statute was "intended to prohibit *all* varieties of cocaine" including any isomers "synthetically produced in the laboratory" and

17

not just "those isomers of cocaine which are the natural product of the coca leaf." *Slyman*, 483 A.2d 519, 524-25, 528 (emphasis added). Notably, positional isomers of cocaine (a type of constitutional isomer) were known to exist when *Slyman* correctly interpreted Pennsylvania's law to reach *all* of cocaine's isomers, whether natural or synthetic. *See United States v. Minter*, 80 F.4th 406, 412 (2d Cir. 2023) ("Constitutional isomers were known to exist when the New York legislature added the term 'isomers' to the definition of cocaine in 1978." (cleaned up)); *United States v. Holmes*, 2022 WL 1036631, *8 (E.D.N.Y. 2022) (citing Robert L. Clarke & Sol J. Daum, ß-Cocaine, 18 J. of Medicinal Chemistry 102, 102-103 (1975) to support conclusion that positional isomers of cocaine were known to exist in 1975); *United States v. Boyce*, 2022 WL 2159890, *4 (S.D.N.Y. 2022) (reciting government's estimate that there are over 12,000 isomers of cocaine, including scopolamine, a constitutional isomer). And positional isomers of cocaine can be derived synthetically, *see* F. Ivy Carroll *et al.*, *Cocaine Receptor: Biochemical Characterization and Structure-Activity Relationships of Cocaine Analogues at the Dopamine Transporter*, 35 J. of Medicinal Chemistry 969, 969 (1992).

18

Unlike the federal statute, which defines cocaine to sweep in only its "optical" and "geometric" isomers, the Pennsylvania statute does not otherwise define the term "isomer" or place any limit on the *type* of isomers included in its definition of cocaine or cocaine derivative. *See* 35 P.S. § 780-102, § 780-104. All isomers necessarily mean optical, geometric, and positional isomers.

By criminalizing *all* isomers of cocaine, Pennsylvania's drug statute thus sweeps more broadly than its federal counterpart.

> ### 4. Multiple courts of appeals have recognized that state laws criminalizing all isomers of cocaine are broader than federal law, which criminalizes only cocaine's "optical" and "geometric" isomers.

Other court of appeals have analyzed similar state statutes involving cocaine that, as Pennsylvania does, reach isomers without defining that term, and concluded that those state statutes sweep in *all* isomers of cocaine and are therefore categorically broader than federal law, which criminalizes only cocaine's optical and geometric isomers. For example, the Second Circuit held that New York's statute—which defines cocaine generally to include isomers, without defining that term—sweeps more broadly than the CSA because it "did not limit itself

to optical or geometric isomers." *United States v. Minter*, 80 F.4th 406, 411-12 (2d Cir. 2023). The Eighth Circuit in *Owen* held that Minnesota's definition of cocaine is broader than its federal counterpart because it bans all cocaine's isomers while "federal law criminalizes just two." *United States v. Owen*, 51 F.4th 292, 295-96 (8th Cir. 2022). In *Myers*, that Court reached the same conclusion with respect to Missouri's definition of cocaine, which includes isomers without defining that term. *United States v. Myers*, 56 F.4th 595, 599 (8th Cir. 2022). *See also United States v. Ruth*, 966 F.3d 642, 648 (7th Cir. 2020) (holding Illinois definition of cocaine, which includes positional isomers, rendered its law overbroad compared to the CSA).[1]

---

[1] The Sixth Circuit addressed a Michigan statute banning cocaine and *only* its "stereoisomers." *United States v. Wilkes*, 78 F.4th 272, 279 (6th Cir. 2023). As set forth, isomers are subdivided into two major types: (1) constitutional isomers, which include positional isomers, and (2) stereoisomers, which include optical and geometric isomers. Orchin, 229-32, 248. Because Michigan does not criminalize constitutional (positional) isomers, *Wilkes* is irrelevant here. *Wilkes*, 78 F.4th at 285 (concluding "stereoisomers" are coextensive with "optical and geometric" isomers).

It is also unpersuasive.

The Sixth Circuit posited an atextual, ahistorical reading of the federal CSA that is out of step with the Second, Seventh, and Eighth Circuits and should not be followed. According to *Wilkes*, when Congress amended the CSA in 1984 to explicitly define cocaine to include *only* "optical and geometric isomers" it really meant "*all*"

Elsewhere, the government has relied on a superficial textual difference between those state statutes and the Pennsylvania statute to argue—implausibly—that Pennsylvania does not criminalize *any* of cocaine's isomers simply because the statute doesn't expressly use the word "isomer." But by that logic, Pennsylvania would not criminalize cocaine, since its definitional section doesn't use the word "cocaine" either. Pennsylvania plainly criminalizes "cocaine"—a "compound, derivative, or preparation of coca leaves" and its reach likewise includes isomers. *See* Appx287.

Just like Pennsylvania, each of these states criminalize "[c]oca leaves and any salt, compound, derivative, or preparation of coca leaves." These jurisdictions go on to use the term "includes" to explicitly identify "isomers" of cocaine as encompassed within that broad category "compound[s], derivative[s], or preparation[s] of coca leaves" or their

---

isomers. The court mused that a contrary reading would leave the "isomer defense" alive and somehow undo Congress' intent. The Sixth Circuit's atextual reading of statutory text is fatal to its analysis. Its interpretation also has been persuasively rejected by at least the Second Circuit. *See Minter*, 80 F.4th at 411. That "constitutional" or positional isomers were known to exist when Congress amended the CSA, *see id.*, and elected not to criminalize them in the cocaine context further undermines the Sixth Circuit's reasoning.

chemical equivalents.[2] *See generally Burgess v. United States*, 553 U.S. 124, 131 (2008) ("[t]he word 'includes' is usually a term of enlargement, and not of limitation."). Those states amended their statutes to make explicit their intent to sweep in *all* cocaine's isomers. *See Minter*, 80 F.4th at 411 (explaining New York amended its statute in 1978, adding the term "isomer" in response to the "isomer defense"); *Myers*, 56 F.4th at 598-99 (discussing caselaw interpreting Missouri's 1987 amendment that made plain "all isomers of cocaine are prescribed"); Minn. Stat. 162.02, subd. 2(3) (1986) (adding term isomer to definition). Given longstanding authority recognizing that isomers are encompassed within the broad category of compounds, derivatives or preparations of

---

[2] *See, e.g.*, NY Penal § 220.00(7) (New York) (any "salt, compound, derivative, or preparation of coca leaves … *including* cocaine and … [its] salts, isomers, and salts of isomers."); MN St § 152.01 Subd. 3a. Coca (Minnesota) ("Coca leaves and any salt, compound, derivative or preparation of coca leaves" "*including* cocaine and … the salts and isomers of cocaine…"); 19 MO ADC 30-1.002(1)(B)(1)(D) (Missouri) ("Coca leaves and any salt, compound, derivative, or preparation of coca leaves … *including* cocaine [and its] … salts, isomers, derivatives, and salts of isomers and derivatives."). *See also* Va. Code § 54.1-3448 (Virginia) ("Coca leaves and any salt, compound, derivative, or preparation of coca leaves … but not including extractions which do not contain … cocaine or any salt or isomer thereof."); Neb. Rev. Stat. § 28-405 (Nebraska) ("Coca leaves and any salt, compound, derivative, or preparation of coca leaves … including cocaine … and its …. optical isomers.").

coca leaves, *see Slyman, supra*, Pennsylvania had no need to amend its statute to explicitly identify isomers. For some different substances added to Pennsylvania's schedules more recently and without the benefit of the *Slyman* decision's interpretation, Pennsylvania has explicitly stated what *Slyman* found to be implicit, that isomers are encompassed within the broad category of "compound, derivative, or preparation." *See e.g.*, 35 P.S. 780-104, Sch. II (ix) (1999) (Ketamine includes any "compound, derivative, or preparation of ketamine, *including* any isomers… of ketamine."); 35 P.S. 780-104, Sch. III (viii) (1999) (GHB includes "any compound, derivative or preparation of gamma hydroxybutyric acid, *including* any isomers" of GHB).[3]

\*\*\*

In sum, Pennsylvania "made a policy choice to define [the cocaine family of substances] as broadly as possible, without any limitation on

---

[3] When the Pennsylvania legislature does explicitly identify isomers, it knows how to limit the *type* of isomer covered when that is its intent. *Compare* 35 P.S. 780-104(ii) ("Any of the following opium derivatives, their salts, isomers, and salts of isomers….") *with* 35 P.S. 780-104(2)(iii)(1) (1972) (listing "Amphetamine, its salts, *optical* isomers, and salts of its optical isomers"). *See Sosa v. Alvarez-Machain*, 542 U.S. 692, 711 n.9 (2004) (when the legislature uses certain language in one part of the statute and different language in another, the court assumes different meanings were intended).

the types of cocaine isomers it includes," and it did so at a time when positional isomers, which are capable of synthetic derivation, "were known to exist." *See Minter*, 80 F.4th 406, 412. Federal law, by contrast, elected to criminalize only "optical" and "geometric" isomers of cocaine. That mismatch resolves this case. Mr. Shelton's decades-old prior convictions cannot serve as predicate "serious drug offenses" to trigger ACCA's 15-year mandatory minimum. The district court's determination should be affirmed on this basis.

D.    **The realistic probability test has no role to play.**

When, as here, the elements of a statute of conviction, as established by the statute's plain text or authoritative court decisions construing that text, criminalize conduct beyond that of the generic federal analog, the two are not a categorical match. The statute is overbroad on its face and the inquiry is over. *See, e.g., Ndungu v. Att'y Gen.,* 126 F.4th 150, 167-68 (3d Cir. 2025); *Cabeda v. Att'y Gen.*, 971 F.3d 165, 176 (3d Cir. 2020); *Salmoran v. Att'y Gen.,* 909 F.3d 73, 81 (3d Cir. 2018); *Zhi Fei Liao v. Att'y Gen.*, 910 F.3d 714, 723 n.9 (3d Cir 2018); *Jean-Louis v. Att'y Gen.*, 582 F.3d 462, 481 (3d Cir. 2009). The

realistic probability inquiry has no role to play. *Id. See* Appx203-07,

294-301 (elaborating on realistic probability test).

Any claim to the contrary is also foreclosed by Supreme Court

precedent, which has never required further proof of a realistic

probability of prosecution when a statute is facially overbroad and has

expressly rejected bids to do so. *See United States v. Taylor*, 596 U.S.

845, 857-58, 859 (2022) (conclusively rejecting the government's

argument for an actual-case requirement even when the statutory text

clearly establishes overbreadth while noting the "oddity of placing a

burden on the defendant to present empirical evidence about the

government's own prosecutorial habits," and "the practical challenges

such a burden would present in a world where most cases end in plea

agreements," not all of which "make their way into easily accessible

commercial databases"); *Mellouli v. Lynch*, 575 U.S. 798, 801 (2015)

(rejecting an actual-case requirement when state controlled substance

offense was facially overbroad). *See also Mathis v. United States*, 579

U.S. 500, 509 (2016) (confirming that when the statute's elements

"cover a greater swath of conduct than the elements of the relevant"

federal offense, that "disparity resolved th[e] case"; the Court did not even mention the "realistic probability" test).

### E. Pennsylvania's definition of cocaine-related substances, which includes derivatives of coca leaves, sweeps in ioflupane, a substance the parties agree is a derivative of cocaine.

#### 1. This Court has no power to issue an advisory opinion deciding whether a post-2015 Pennsylvania cocaine conviction is a "serious drug offense."

The government irrelevantly and inexplicably maintains that Pennsylvania has never criminalized ioflupane. *See* Step-Two Br.15, 20-23. Whether the Pennsylvania statute criminalizes ioflupane and sweeps more broadly that its federal counterpart on that basis would be relevant only in a case involving a state conviction post-dating the September 2015 federal de-scheduling of that substance. Oronde Shelton's prior drug offenses date back to 1992. *Brown's* timing rule thus resolves the ioflupane overbreadth argument. This Court should decide whether a post-2015 Pennsylvania cocaine offense qualifies as a serious drug offense because Pennsylvania criminalizes ioflupane while its federal counterpart does not in an appeal presenting that question; this appeal does not.

26

The exercise of judicial power under Article III of the Constitution depends on the existence of a case or controversy. *Preiser v. Newkirk*, 422 U.S. 395, 401-02 (1975). "[A] federal court has neither the power to render advisory opinions nor 'to decide questions that cannot affect the rights of litigants in the case before them.' Its judgments must resolve "a real and substantial controversy… as distinguished from an opinion advising what the law would be upon a hypothetical state of facts." …. 'The rule in federal cases is that an actual controversy must be extant at all stages of review…." *Id.*, 422 U.S. at 401-02.

The Court need not engage with this argument for an additional reason. Even if the government were correct that Pennsylvania's definition of cocaine-related substances never included ioflupane—it is not—Pennsylvania's definition remains broader than the federal definition because it sweeps in *all* isomers of cocaine while the federal definition sweeps in only certain isomers. *See* Part I.C.

To the extent this Court considers this argument, it should reject it on the merits as Pennsylvania criminalizes ioflupane.

### 2. Pennsylvania's definition of cocaine-related substances includes ioflupane.

Pennsylvania's definition of cocaine-related substances includes ioflupane, as the government below acknowledged, *see* Appx233, 234, 238, 243,[4] and as the district court properly found, Appx784-85. *See also*

---

[4] In the district court, the government repeatedly acknowledged "Ioflupane remains a Schedule II controlled substance in Pennsylvania": "While Ioflupane has been removed from the list of federal controlled substances, ***it has not been removed from Pennsylvania's controlled substance list***, ***and therefore is still considered a Schedule II controlled substance under Pennsylvania law***." Appx238, 234, 243. The government elaborated, "[b]oth the federal statute and the state statute criminalize cocaine, a derivative from the coca leaf. Without modification, both the federal and state statute would also criminalize [$^{123}$I]Ioflupane (hereinafter, "Ioflupane"), a substance that is derived from cocaine via ecgonine." Appx233. The government further acknowledged that the Pennsylvania statute "is broader" than the federal statute "**because the [state statute] continues to criminalize Ioflup[]ane** while the [federal statute] does not." Appx243.

The government simply took the irrelevant position, *see* Appx294, that ioflupane is not *identical* to cocaine. Appx233. On appeal, the government has abandoned that position. *See* Step-Two Br.21-22.

In that regard, the government has also abandoned its incorrect (*see* Appx286-93) and unsupported assertion that 35 P.S. § 780-104(2)(i)(4), is *itself* divisible, *i.e.,* that the varieties of substances falling within that definitional section are alternative elements of separate crimes. *See also* Appx783-84 (district court rejecting that argument).

The government may not attempt to resurrect either claim in its Reply Brief. *See Harvey v. Plains Twp. Police Dep't*, 421 F.3d 185, 192 (3d Cir. 2005) (a party waives argument if it is raised for the first time in a reply brief).

Step-Two Br.15 & 18 (acknowledging the Pennsylvania statute does not exclude ioflupane).

Instantly, the government inexplicably and baldly asserts that ioflupane is "decocainized [coca leaves or] extracts of coca leaves, [which extracts do not contain cocaine or ecgonine]" and is therefore excluded from Pennsylvania's drug schedules. Step-Two Br.21-22.[5] The government does not support this statement with citation to any evidence. *Id.* Nor can it as this claim defines both chemistry and logic.

The Pennsylvania statute criminalizes "[c]oca leaves and any salt, compound derivative, or preparation of coca leaves" and excludes "decocainized coca leaves or extracts of coca leaves, which extracts do not contain cocaine or ecgonine." 35 P.S. § 780-104(2)(i)(4). Decocainized extract of coca leaves is a term commonly used in regulatory contexts, as in FDA food additive regulations. *See, e.g.*, 21 C.F.R. § 182.20. The

---

[5] By order entered January 16, 2024, the court noticed its intent to grant Mr. Shelton's objection to application of the Armed Career Criminal Act. *See* Appx48. On February 13, 2024, just before sentence was imposed, the government advanced the within argument that Pennsylvania has never criminalized ioflupane. Appx776-77. The government below offered *no* evidentiary support for this new argument. Nor did it reconcile its new position with its earlier acknowledgement that Pennsylvania criminalizes ioflupane.

government's theory is as follows: Cocaine is an extract of coca leaves and ioflupane is derived from cocaine; therefore, ioflupane is "decocainized coca leaves or extracts of coca leaves, which extracts do not contain cocaine or ecgonine." Step-Two Br. 22. The government's theory depends on several flawed premises.

First, "decocainized coca leaves" means coca leaves from which cocaine has been removed through an extraction process. Cocaine is plainly not "coca leaves or extracts of coca leaves" from which cocaine has been removed.

Second, ioflupane is not an extract from cocaine; it is derived from cocaine via ecgonine, as the government elsewhere acknowledges.

Third, and more fundamentally, ioflupane, as the parties agreed, is a *synthetic* substance which is **not** found naturally in coca leaves. It is "derived," that is "made from" a sequence of chemical reactions by humans in a lab. *See* https://www.merriam-webster.com/dictionary/derivative (chemistry a: a chemical substance related structurally to another substance and theoretically derivable from it; b: a substance that can be made from another substance").

30

Therefore, ioflupane plainly is not decocainized coca leaves or extracts of coca leaves.[6]

The government cites to nothing beyond its *own* appellate brief in another appeal[7] as support for its bizarre attempt to transform ioflupane into coca leaves or extracts of coca leaves from which the cocaine has been removed. Step-Two Br. 21. *That* brief relies exclusively on an untested declaration filed in yet another matter by Roscoe Bennett, a Pennsylvania State Police Laboratory System Quality Specialist. Appx266. But that declaration was not before the district court here and, as the government implicitly concedes, may not be noticed in this case. *See* Fed.R.Evid. 201(b); Fed.R.App.P. 10(a) (limiting the record on appeal to those original papers filed in the district court). The Bennett declaration provided to the district court in this matter ***does not*** contend that ioflupane is "decocainized" coca leaves

---

[6] In chemistry, the prefix "de-" generally signifies "removal" or subtraction." Since ioflupane was never in coca leaves it cannot be removed from coca leaves and cannot be an extract of coca leaves. The government's argument is nonsensical.

[7] *See United States v. Gamble*, Nos. 23-2105 & 23-2199 (3d Cir.).

or extracts of coca leaves. To the contrary, Bennett *agrees* ioflupane is a "derivative" of coca leaves. Appx266.

As summarized, the Pennsylvania statute criminalizes "any" "derivative" of coca leaves. Ecgonine is a derivative of the coca leaf. Cocaine is derived from ecgonine. https://sciencedirect.com/topics/chemistry/ecgonine. And, as the parties agree, ioflupane is a "derivative" of cocaine via ecgonine.[8] *See* Appx233 (government acknowledging cocaine as a derivative from the coca leaf and ioflupane as "derived from cocaine via ecgonine; acknowledging ioflupane's "derivative origin"); 236 (government acknowledging ioflupane is "a derivative of coca leaves"), 243 (government acknowledging ioflupane as one of multiple "coca-leaf derivatives).

In short, ecgonine, cocaine, and ioflupane all fall within Pennsylvania's definition of cocaine-related substances because *all* are derivatives of the coca leave. Notably, this Court has already concluded

---

[8] "[$^{123}$I]Ioflupane is, by definition, a schedule II controlled substance because it is derived from cocaine, a schedule II substance, via ecgonine (a schedule II substance). *See* 21 U.S.C. 812(c), Schedule II, (a)(4)." *See* Schedules of Controlled Substances: Removal of [123 I] Ioflupane From Schedule II of the Controlled Substances Act, 80 Fed. Reg. 54715, 54716 (Sep. 11, 2015) (hereinafter "DEA Removal of Ioflupane").

that a materially identical state statute that "criminalizes *any*

derivative of coca leaves" necessarily included ioflupane, a derivative of

coca leaves. *Martinez v. Att'y Gen.*, 906 F.3d 281, 287 (3d Cir. 2018).

The federal statutes confirm that ioflupane is a derivative of coca

leaves and does not fall within the statutory exception for decocainized

coca leaves or extracts. Before 2015, the federal definition of the

cocaine-family of substances was materially identical to the

Pennsylvania definition and contained the same exception for

"decocainized coca leaves or extraction of coca leaves, which extractions

do not contain cocaine or ecgonine":

> (4) Coca leaves (9040) and *any* salt, compound, ***derivative*** or
> preparation ***of coca leaves (including cocaine (9041) and ecgonine***
> (9180) and their salts, isomers, derivatives and salts of isomers
> and derivatives), and any salt, compound, derivative, or
> preparation thereof which is chemically equivalent or identical
> with any of these substances, *except that the substances shall not*
> *include decocainized coca leaves or extraction of coca leaves, which*
> *extractions do not contain cocaine or ecgonine.*

21 C.F.R. § 1308.12, Schedule II (eff. Dec. 10, 2007 to Sept. 10, 2015)

(emphasis added). Following the 2015 removal of ioflupane from the

Controlled Substances Act schedules, § 1308.12 was revised to

specifically exclude ioflupane:

33

(4) Coca leaves (9040) and any salt, compound, derivative or preparation of coca leaves (including cocaine (9041) and ecgonine (9180) and their salts, isomers, derivatives and salts of isomers and derivatives), and any salt, compound, derivative, or preparation thereof which is chemically equivalent or identical with any of these substances, except that the substances shall not include:

(i) Decocainized coca leaves or extraction of coca leaves, which extractions do not contain cocaine or ecgonine; or

(ii) [[123] I]ioflupane.

*Id.* (effective September 4, 2015). If ioflupane were in fact "[d]ecocainized coca leaves or extraction of coca leaves, which extractions do not contain cocaine or ecgonine" there would have been no need to separately list ioflupane in the federal statute excepting those substances. The government makes no attempt to explain why ioflupane had to be removed from the schedule if it fell within a pre-existing statutory exception.

In sum, and while the Court should not and need not reach this issue, Pennsylvania's definition of cocaine-related substances at the time of Mr. Shelton's offenses and now sweeps in derivatives of cocaine, including ioflupane.[9]

---

[9] Parenthetically, the government persists in arguing that Mr. Shelton must show a realistic probability the state would prosecute

*Argument in Reply for Oronde Shelton as Appellant*

## I. The district court erred by applying a four-level enhancement for use of a firearm "in connection with another felony offense" because Mr. Shelton was justified in instinctively returning fire at assailants who ambushed and shot at him.

The parties agree that Mr. Shelton acted in justifiable self-defense on March 17, 2021, when he responded to an unprovoked ambush by armed assailants who boxed him in on a public road and fired multiple rounds at him by returning fire before extricating himself from the attack. *See* Step-Two Br.27, 29 & n.5. Because that momentary retaliatory use of force was justified, the parties agree Mr. Shelton cannot be criminally liable for shooting at the aggressors' car or recklessly endangering bystanders, meaning § 2K2.1(b)(6)(B)'s four-level enhancement for using or possessing a firearm "in connection with another felony offense" cannot be applied. *See* Step-Two Br.31.[10] The

---

ioflupane. *See* Step-Two Br.23-25. This argument both is irrelevant given *Brown's* impact on the ioflupane overbreadth claim and wrong. When, as here, the state statute on its face covers a substance not included on the federal schedules, this ends the inquiry; the realistic probability inquiry has no role to play. *See e.g., Salmoran v. Attorney General*, 909 F.3d 73, 81-82 (3d Cir. 2018). *See also* Step-Three Br., Part I.D., *supra.*

[10] The government acknowledges that both the district court's bases for applying § 2K2.1(b)(6)(B)'s 4-level enhancement were wrong.

district court began sentencing proceedings using an incorrect, higher Guidelines range; therefore, remand for resentencing is required. *See United States v. Langford*, 516 F.3d 205, 215-18 (3d Cir. 2008).

The government resists that conclusion. First, it urges this Court to ignore the Guideline miscalculation. According to the government's premature speculation, that miscalculation will become moot on remand because it predicts that the Armed Career Criminal Act will apply and the ACCA-driven range will trump the non-ACCA range. Step-Two Br.27-28. Second, the government invites this Court to affirm the enhancement on an alternative basis. This Court should reject both arguments and remand for resentencing without the enhancement.

A.    **The Guideline miscalculation is not moot.**

The Guideline miscalculation is not moot because *even if* the government prevails in its cross-appeal, it is by no means certain Mr.

---

Step-Two Br. 29 & n.5. First, the district court erred by equating Mr. Shelton's lack of justification to excuse his sustained possession of a firearm during the March to April period charged in the indictment in violation of § 922(g) with a lack of justification to excuse his momentary retaliatory use of force on March 21. *Id*. Second, the instant offense of conviction, possession of a firearm equipped with an auto seer, is not "another felony offense" and cannot support application of the four-level enhancement. *Id*. *See* Step-One Br. 20-38.

Shelton would be subject to the Armed Career Criminal Act on remand. Were this Court to ultimately determine that Mr. Shelton's prior Pennsylvania convictions qualify "serious drug offenses"—Mr. Shelton maintains that his remote drug convictions are ***not*** qualifying "serious drug offenses," *see* Part I.C, *supra*—, the remedy would be remand for resentencing. *See Pepper v. United States*, 562 U.S. 476, 507-08 (2011). At that resentencing, Mr. Shelton may argue, as previewed below, that he is not subject to the ACCA because the government cannot prove those convictions occurred "on occasions different from one another." *Erlinger v. United States*, 602 U.S. 821, 841 (2024) (holding that only a jury may decide whether prior offenses were committed on different occasions while stressing that "no particular lapse of time … automatically separates a single occasion from distinct ones."); *Wooden v. United States*, 595 U.S. 360, 369 (2022) (holding that the occasions clause requires "a holistic, multi-factored approach" considering "time," "proximity of location," and the degree to which "the conduct giving rise to the offenses" is "similar or intertwined."); *United States v. Cogdill*, 130 F.4th 523 (6th Cir. 2025) (vacating ACCA sentence where prior drug offenses were separated by a three-month gap; explaining that a

single occasion may encompass multiple, temporally distinct activities

and that no particular lapse of time or distance between offenses

automatically separates a single occasion from distinct ones). *See*

Appx119, 131-32, 144, 152 & 319-20 (defense counsel referring to

*Wooden* and previewing argument that the state offenses were not

committed on occasions different from one another); PSR ¶¶31, 32

(describing plea and sentencing occurring on a single day to offenses

committed in the same county and involving the same drug). *See also*

Appx 699 (defense counsel asserting that Mr. Shelton did not knowingly

and intelligently admit elements of ACCA in open plea where court had

deferred ruling on his objections to the ACCA until sentencing) and

Appx770 & 779 (wherein the district judge made clear it did not find the

guilty plea effected an admission to § 924(e)).[11] This Court should

therefore reject the government's premature speculation about the

---

[11] On May 11, 2023, well in advance of Mr. Shelton's February 2024 sentencing, this district judge accepted the purely legal argument, which argument was advanced by Mr. Shelton below, that a conviction under Pennsylvania's cocaine statute is not a predicate "serious drug felony." *See United States v. Gamble*, No. 2:21-cr-142 Doc. 135 (W.D.Pa., May 11, 2023); *see also* Appx760. Thus, Mr. Shelton would have understood that there was no need to pursue the alternative argument that his non-qualifying state predicates *also* did not occur on separate occasions.

outcome of any resentencing proceeding and reach the threshold

Guideline calculation error. *See also United States v. Santana*, ___ F.4th

___, 2025 WL 1739593 (7th Cir. 2025) (vacating and remanding on plain

error where the judge, not a jury, determined by a preponderance the

prior convictions were committed on different occasions).

### B.   **It was undisputed that Mr. Shelton's momentary retaliatory use of force when confronted while on foot by a fast-approaching armed drive-by shooter was justified.**

The government concedes that Mr. Shelton was justified in

instinctively returning fire when he was ambushed on the roadway in

March 2021, yet it urges this Court to affirm the 2K2.1 enhancement on

an alternative basis. This Court cannot affirm on the proposed basis for

multiple reasons, most obviously because the district court did not make

any findings of fact necessary to support the proposed alternative

ruling, and this Court is not a factfinding tribunal. *See, e.g.*, *United

States v. Lianidis*, 599 F.3d 273, 283 n.11 (3d Cir. 2010) (declining to

affirm sentence enhancement on alternative ground because the court

below did not engage in the necessary factfinding and the appellate

court "is not a factfinding tribunal"); *Berardi v. Swanson Mem. Lodge

No. 48 of the Fraternal Order of Police*, 920 F.2d 198, 201-02 (3d Cir.

1990) (declining to affirm on alternative ground where record was silent on factual prerequisites to affirmance); *see also Rosenberg v. DVI Receivables XVII, LLC*, 835 F.3d 414, 422 n.6 (3d Cir. 2016) (declining to affirm on alternative ground where the record did not unequivocally support that ground).

Moreover, the proposed alternative ground fails on the merits. As will be illustrated, Mr. Shelton offered unrebutted testimony that he acted in self-defense responding to a January drive-by shooting at the Waldorff Street residence. The government bore the burden to rebut that claim of self-defense, and it did not do so. *See, e.g., A. Kemp Fisheries, Inc. v. Castle & Cooke, Inc., Bumble Bee Seafoods Div.*, 852 F.2d 493, 497 (9th Cir. 1988) (rejecting appellee's invitation to affirm on alternative basis where appellee bore the burden in the district court and was responsible for gaps in the evidentiary record).

### 1.    The Evidentiary Hearing

The district court conducted a hearing to ascertain whether Mr. Shelton was entitled to present to the jury a justification defense to excuse his continuous possession of the firearm between March 17, 2021 and April 24, 2021, in violation of 18 U.S.C. § 922(g)(1). *See* Appx371-

73.[12] At that hearing, Mr. Shelton testified that he had long been the subject of false rumors that he was a law enforcement informant and that those rumors endangered his safety. Appx516-28. Mr. Shelton grounded his belief that he faced imminent danger the entire time he possessed a firearm not solely on rumored threats, but on an actual drive-by shooting perpetrated by unknown assailants in January 2021 outside his sister's residence. *See* Appx373,532; *see also* Appx769 (district court acknowledging Mr. Shelton's claims of self-defense). The government now urges this Court to consider Mr. Shelton's testimony describing the January drive-by shooting as proof that he used the firearm in connection with another felony offense, aggravated assault and reckless endangerment. And it urges this Court to affirm the 2K2.1 enhancement on that alternative basis.

Preliminarily, the government did not prove either offense by a preponderance. Police investigating the January ShotSpotter alert

---

[12] Following that hearing, the district court determined that Mr. Shelton did not establish that he faced a "present" threat of harm during the entire period between March 17 and April 24, 2021, and so could not justify his "sustained" possession of a firearm in violation of § 922(g)(1). Appx608-09. Thus, he was not entitled to present a justification defense to the § 922(g) charge. Appx613. Mr. Shelton has not challenged that ruling.

confirmed that the initial shots were fired (presumably by the drive-by assailants) followed within a minute by return fire from an automatic weapon. Appx381-82, 409. Police never interviewed eyewitnesses to the incident and never identified the drive-by shooters or victims other than the person whose car was hit by the drive-by shooters. Appx376, 383, 391. Police did not have sufficient information to seek any warrant and did not have probable cause to file any charges against any person in connection with this episode. Appx410-11. Nor is it clear the January 2021 episode is relevant conduct such that it could form the basis for the 2K2.1 enhancement. *See* Appx416 (prosecutor averring that the January incident "had no part of the federal case initially and now they are making it a part" through the request for a justification jury instruction). Even if the government could overcome these obstacles, its argument fails on the merits.

> ### 2. Mr. Shelton was justified in instinctively returning fire when a drive-by shooter barreled toward him with his firearm raised.

Mr. Shelton offered unrebutted testimony that he acted in self-defense, and the physical evidence did nothing to undermine that claim. The government bore the burden of negating the affirmative defense of

justification with proof by a preponderance that Mr. Shelton did not reasonably believe he was in imminent danger, that he provoked the use of force, or that he had a duty to retreat and that retreat was possible with complete safety. *See* 18 Pa. C.S. § 505(b)(2); *United States v. Fisher*, 420 A.2d 427 (Pa. 1980). The government did not carry its burden. The January incident therefore cannot support the 2K2.1 enhancement because Mr. Shelton's unrebutted testimony that he acted in self-defense during the January drive-by would have negated state assault or reckless endangerment charges. *See, e.g., United States v. Eddington*, 65 F.4th 1231, 1238 (10th Cir. 2023).

1.    First, it was undisputed that Mr. Shelton was confronted with deadly force and reasonably believed force was immediately necessary to protect himself or others.

On January 24, 2021, Oronde Shelton was pulling up to the Waldorf Street residence as a friend (Destiny) who drove the same make, model and color car as he did, was pulling away. Appx529-31; *see also* Appx495-96.[13] Assailants in a red car "zoomed past" the residence

---

[13] Mr. Shelton had a key to 219 Waldorf and was welcome to come and go as he pleased. Appx552.

and fired shots, hitting Destiny's car, as she drove away, before turning around and "flying back up the street." Appx495-96, 502, 503, 530-31; *see also* Appx381 (officer describing the dead-end street and the distance between the residence where the shots were fired and the turn around as "maybe a hundred yards or so").

Mr. Shelton was walking toward the house when he heard a gunshot or two. Appx530-31. He asked a neighbor, "what [was] that?" Appx530. The neighbor pointed at a red car that was "flying back up from the dead end" while displaying a firearm: "When I looked at the car, the dude is coming out the window." Appx530. *See also* Appx550 (Shelton reiterating during cross-examination, "As I'm asking… [the] neighbor pointed at the car as it is coming back up the street and they are coming back in my direction"). That's when Mr. Shelton took out his gun and fired in the direction of the red car. Appx550-51.

Alena Shelton, Oronde's sister, confirmed that the drive-by shooters zoomed past her house on the return trip while leaning out and displaying "a bigger gun" "like a rifle." Appx496, 503. "That's when [Mr. Shelton] raised [his] gun and [] fired at him." Appx530. "They ducked back into the car and flew past the house." Appx530, 531. Thus, Mr.

44

Shelton's sister corroborated his testimony that he pulled out his gun only in response to the armed aggressors' approach.

2.    Second, there was *no* evidence Mr. Shelton provoked the use of force.

3.    Third, and finally, the government did not offer *any* evidence that Mr. Shelton violated a duty to retreat or that retreat was possible with complete safety.

At the hearing below, the government put on *no* evidence to establish Mr. Shelton—who stood exposed on foot near the street and vulnerable to an individual who was leaning out of a fast-moving car displaying a firearm—would have been able to retreat with complete safety. Indeed, the evidence established that far from disengaging following its initial drive-by shooting, an occupant of the red car on the second pass by 219 Waldorf was leaning out and displaying "a bigger gun" "like a rifle." Appx496, 503. "[T]he law does not require an accused to elect an avenue of retreat where a reasonably prudent person would conclude that such a decision would increase his or her exposure to the threatened harm. *Commonwealth v. Bayard*, 309 A.2d 579, 582 (Pa. 1973).

The entire episode—the drive-by shooting, the turn-around, and the second pass—happened "very quick[ly]." Appx496. Abena estimates that the initial and retaliatory shots were fired within a minute of each other. Appx504-05. *See also* App.408-09 (reciting ShotSpotter's estimate of one minute between the initial shot (from the car) and the return fire). When the return shots were fired, Mr. Shelton was near his car, which was parked near her front door, and the red car was "coming back down the street like right side by side" … "driving past real close." Appx506-07. Shell casings were recovered somewhere in front of 219 Waldorf. Appx381-82.

The appellate prosecutor now speculates that Mr. Shelton "waited in the yard to shoot at his assailant" when he "easily" could have avoided the danger with complete safety by going inside the house. Step-Two Br.16, 34. The government below presented no evidence to support that claim. Moreover, the record does not contain any finding of fact by the district court to that effect.

Mr. Shelton explained he was "walking towards the house like I'm in the grass going towards the porch," and he added that the porch leading to the front door was separated from the front yard by stairs.

46

Appx530. His sister recalled that he was by his car, which was parked across from her front door on her side of the street. Appx505. The appellate prosecutor cites Appx599, a google maps image, and offers his own "testimony" on the distance in feet between the street and porch. G.Br.34. That measurement is nowhere in the record.

Regardless, the critical unrebutted testimony was Mr. Shelton's statement that he only realized what had happened after a neighbor identified the red car as the source of the gunfire *while* that car was speeding toward him, with one occupant leaning out of the window displaying a firearm. Appx496-07 (red car speeding by "real close" to Oronde when he fired), 503, 530, 550. It's at that point that Mr. Shelton saw "the barrel of the gun coming out the window" and "raised his gun and fired" in self-defense. Appx530, 531. The government below offered no evidence Mr. Shelton knew he could have run up and into the house in complete safety in that moment.

Indeed, during cross-examination, Mr. Shelton made clear that he was confronted with deadly force and had no opportunity to retreat in complete safety:

> Q. [AUSA]    After hearing a shot or two fired, you talked to
> your neighbor quickly to see if he could tell you

any information while the shooter drove down to the end of the dead end street, right?

A. [Mr. Shelton] No. I was talking to the neighbor to see what happened and as I'm asking him, Mr. Such and such, what was that, he is like the car right there and he points at the car, and then a car is speeding back up the street. It wasn't going down the street. When the old man told me what he seen was that car right there, he pointed at the car as it is coming back up the street and they are coming back in my direction.

Q. So that's the first time you really see the car when it's coming back to you after having already turned around?

A. Exactly.

Appx550. It's at that point, as Mr. Shelton stood vulnerable near his car, that Mr. Shelton saw "the barrel of the gun coming out the window" and fired in self-defense. Appx505, 530, 531, 550-51.

It is "the assailant, not the victim, [who] picks the time, place, manner, and the circumstances of the attack. Leisurely assessment of the circumstances is almost never a feature of such an assault… [M]ost often the best the victim can do is to mount a defense which hopefully will preserve his life." *Commonwealth v. Fowlin*, 710 A.3d 1130 (Pa. 1998). As in *Fowlin*, Mr. Shelton was confronted by an aggressor armed with a firearm. He had "only seconds to act…to avoid injury or death"

48

and "acted instinctively and within [Pennsylvania] law in defending himself." *Fowlin*, 710 A.2d at 1133-34. *See generally Commonwealth v. Highsmith*, 2017 WL 2312344, at *13 (Pa. Super. 2017) (the Commonwealth failed to meet its burden of proving the defendant had an opportunity to retreat and "knew" he could have retreated "with complete safety" where Highsmith testified that the victim lunged at him (knowing he was armed) as he was backed up against a house and that he fired three shots in rapid succession and the government did not put on evidence rebutting Highsmith's testimony). *Compare Commonwealth v. Rivera*, 983 A.2d 1211, 1121-22 (Pa. 2009) (in flight from plain clothes officer who had not drawn or displayed any weapon during the chase, defendant turned and fired twice, killing the officer; the court concluded that the evidence showed the defendant could have avoided the use of force by retreating with complete safety, that is, by continuing to run). *See also* First-Step Br.29 (citing cases).[14]

---

[14] The non-precedential opinions cited by the government present wildly different facts and do nothing to help the government meet its burden of proving Mr. Shelton knew he could have retreated in complete safety. *See* Step-Two Br.35-36. For example, in *Commonwealth v. Hawkins,* the facts clearly established that Hawkins *was the initial aggressor* such that he could not claim self-defense. *Id.*, 2014 WL 10986149, *5 (Pa. Super. 2014) (non-precedential). The

*Hawkins* opinion goes on to recount that after the initial fight ended, Hawkins disengaged and walked away, signaling the end of the confrontation. In a discussion that appears to be dicta and is difficult to square with precedential authority, the court faults Hawkins for not retreating to his home, which was nearby, and instead standing across the street. *Id.* A different person subsequently crossed the street and renewed the fight by punching Hawkins as he was talking to others; Hawkins reacted by stabbing his assailant. *Id.*, *1. To the extent *Hawkins* has any value, it is inapposite as Mr. Shelton was indisputably ***not*** the initial aggressor.

The government's second case, *Commonwealth v. Johnson*, 245 A.3d 1049, *2 (Pa. Super. 2020) (not precedential), stands for non-controversial proposition that a defendant will be found to know he can retreat with complete safety when the victim signals that the confrontation is over *before* the defendant employs force. *See Commonwealth v. Walley*, 353 A.2d 396, 398 (Pa. 1976) (concluding the defendant could have retreated in complete safety when he found himself in a vacant lot with the extremely intoxicated victim who was swinging a pipe at the defendant *while backing away*); *Commonwealth v. Isaacman*, 409 A.2d 880, 881 (Pa. Super. 1979) (defendant violated duty to retreat where the evidence established *the decedent was walking away when the defendant shot him in the back*); *see also Commonwealth v. Bartlow*, 2015 WL 7453348, *10 (Pa. Super. 2015) (defendant had duty to retreat where a much older, inebriated opponent was winded and *walking away*). In *Johnson*, the defendant picked up the victim's gun after it fell from the victim's waistband during a tussle. The victim put his hands in the air and backed away, and defendant shot the victim. The defendant then shot at a second, unarmed man during a foot chase that ensued. *Johnson,* 245 A.3d 1049, *3.

Here, as set forth, the assailants in the red car were the initial aggressors and far from signaling the confrontation was over, they continued the attack by turning and barreling toward Mr. Shelton with a firearm drawn.

Because *Johnson* and *Hawkins* bear no resemblance to the instant matter, and the final case cited, *Commonwealth v. Murray*, 260 A.3d 161 (Pa. Super. 2021) (not precedential), involved an *unarmed* victim, they do nothing to establish that Mr. Shelton had a duty to retreat.

That the *prosecutor* might have disbelieved Mr. Shelton's testimony is no substitute for the affirmative proof required to defeat Mr. Shelton's self-defense claim. "[T]he Commonwealth cannot sustain its burden" to disprove a self-defense claim "solely on the fact finder's disbelief of the defendant's testimony…. [D]isbelief… does not, taken alone, [constitute] affirmative proof…." *Commonwealth v. Torres*, 766 A.2d 342, 344-45 (Pa. 2001). In *Torres,* the Pennsylvania Supreme Court reversed an assault conviction because the Commonwealth did not rebut the defendant's claim of self-defense. *Id.*, 766 A.2d at 344-45. There, the defendant's testimony that the victim punched him *before* he punched back in self-defense was not contradicted by the victim (who did not testify), any witness, or the medical evidence. *Id.* Similarly, in *Commonwealth v. Wansley,* the Pennsylvania Superior court vacated assault and related convictions where the defendant asserted the affirmative defense of self-defense and the Commonwealth presented no evidence to rebut his account of the incident. *Id.*, 2013 WL 11248586, at *5 (Pa. Super. 2013). The defendant there offered uncontradicted testimony that he was punched twice in the head by the victim and responded by stabbing the victim in self-defense. As here, the

Commonwealth did not present any evidence that the defendant

provoked the attack or violated a duty to retreat as by leaving a secure

environment to continue the fight. *Id.*, 2013 WL 11248586, at *5.[15]

Here, too, Oronde Shelton's claim of self-defense was corroborated

by another witness and not contradicted by affirmative proof including

by any witness or physical evidence establishing that Mr. Shelton knew

he could retreat from rapidly approaching armed drive-by shooters with

---

[15] Because the assailants in the red car were displaying and using
a firearm, Mr. Shelton would not have had a duty to retreat in any
event. Pennsylvania law generally provides that there is no duty to
retreat if the person against whom force is used is displaying or using a
firearm. *See* 18 Pa. C.S. § 505(b)(2.3). The government argues that
statute does not apply to relieve the actor of the duty to retreat if the
actor "is in illegal possession of a firearm." Step-Two Br.33 (quoting §
505(b)(2.3)). As set forth, Mr. Shelton was not the aggressor and had no
ability to retreat with complete safety. The aggressor had just
discharged his firearm and was displaying it while speeding close to Mr.
Shelton when Mr. Shelton discharged his own firearm in self-protection.
The government did not put on *any* evidence rebutting Mr. Shelton's
defense of justification. Thus, this Court need not decide the contours of
the duty to retreat under the Pennsylvania statute. Nevertheless, Mr.
Shelton maintains there is no duty to retreat in the circumstances
presented notwithstanding his possession of a firearm. Florida Courts,
construing a similar state statute, have refused to read the statute as
precluding a finding of immunity from prosecution just because the
defendant admitted being in unlawful possession of the firearm if the
circumstances precluded any ability to retreat before using force. *See
Jimenez v. State*, 352 So.3d 1286, 1288 (Fla. 2d DCA 2023).

complete safety. The government's proposed alternative basis for affirmance fails on the merits.

Moreover, the government's proposed alternative basis for affirmance also must be rejected because the court below did not find any fact necessary to defeat Mr. Shelton's self-defense claim, including any facts establishing that Mr. Shelton failed to retreat when he knew he could have done so safely, and this Court is not a factfinding tribunal. *See, e.g.*, *Lianidis*, 599 F.3d at 283 n.11 (declining to affirm sentence enhancement on alternative ground because the court below did not engage in the necessary factfinding and the appellate court "is not a factfinding tribunal"); A. *Kemp Fisheries, Inc.*, 852 F.2d at 497 (rejecting appellee's invitation to affirm on alternative basis where appellee bore the burden in the district court and was responsible for gaps in the evidentiary record).

In sum, the court's Guideline miscalculation requires remand for resentencing without the four-level enhancement. *See* Step-One Br. 37-38.

**II.**     **By basing its upward variance to the statutory maximum for the firearms possession and its consecutive top-of-the-revocation-range sentence for the supervised release violation on improper factors and factors fully captured by the guidelines, the district court imposed a procedurally and substantively unreasonable sentence.**

Mr. Shelton relies on his opening brief, wherein he argues that the district court's procedural error, specifically its misapplication of the law of justification to increase the guideline range and to upwardly vary, *see* Appx828, contributed to its imposition of a substantively unreasonable sentence. First-Step Br. 39-50.[16] The government does not dispute that if this Court determines that the Guidelines range was incorrectly calculated, it may remand both sentences without considering the reasonableness of the sentence, as a correctly calculated Guideline range is a necessary precondition of reasonableness review. *See United States v. Langford*, 516 F.3d 205, 211, 214 (3d Cir. 2008).

---

[16] The government incorrectly presumes that the only form of procedural error at sentencing consists of a sentencing court's failure to acknowledge and respond to properly presented sentencing arguments having colorable legal merit and a factual basis. And it unnecessarily insists no such error occurred here even though no such claim was made. G.Br.38-39.

**III.     Sections 922(g)(1) and 922(o) violate the Second Amendment facially and as applied to Mr. Shelton.**

Mr. Shelton argues that his convictions pursuant to 922(g) and 922(o) violate the Second Amendment facially and as applied and should be vacated. *See* First-Step Br. 51-66. *See also United States v. Brown*, 764 F.Supp.3d 456 (S.D.Miss., Jan. 29, 2025) (concluding that the government has not shown that machineguns are dangerous and unusual and sustaining as-applied challenge to 922(o)) (following *United States v. Morgan*, 2024 WL 3936767 (D.Kan., 2024)). He has acknowledged that he was on supervised release at the time of the charged firearm offense and that this Court is bound by its earlier decision in *United States v. Moore*, 111 F.4th 266 (3d Cir. Aug. 2, 2024), *petition for certiorari denied, Moore v. United States*, S. Ct. No. 24-96 (June 30, 2025). Mr. Shelton continues to raise this issue and to argue that *Moore* was wrongly decided to preserve the matter for further review.

# CONCLUSION

As set forth more fully in the opening brief, 18 U.S.C. §§ 922(g)(1) and 922(o) violate the Second Amendment; the convictions should be vacated. Alternatively, this Court should affirm the district court's ruling that Mr. Shelton's prior drug convictions are not "serious drug offenses" within the meaning of the Armed Career Criminal Act, but it should remand for resentencing without U.S.S.G. § 2K2.1(b)(6)'s four-level enhancement.

Respectfully submitted,

*/s/ Renee Pietropaolo*
Renee Pietropaolo
Assistant Federal Public Defender

Counsel for Appellant
Oronde Shelton

## CERTIFICATE OF BAR MEMBERSHIP

It is hereby certified that Renee Pietropaolo is a member of the bar of the Court of Appeals for the Third Circuit.

*/s/ Renee Pietropaolo*
Renee Pietropaolo
Assistant Federal Public Defender

July 7, 2025

# CERTIFICATE OF COMPLIANCE

I, Renee Pietropaolo, Assistant Federal Public Defender, hereby certify the following:

1.     This brief complies the type-volume limitation of Federal Rule of Appellate Procedure 28.1(e)(2)(A)(i) because it contains 11,424 words excluding the parts of the brief exempted by Fed. Rule App. P. 32(f).

2.     This brief complies with the typeface and type-style requirements of Federal Rules of Appellate Procedure 32(a)(5) and (a)(6) because it has been prepared in a proportionally spaced typeface using Word 365 in font size 14, type style Century Schoolbook.

3.     This brief complies with 3d Circuit L.A.R. 31.1 (2011) because the text of the electronic brief is identical to the text in the paper copies. Further, the electronic version of the attached brief was automatically scanned by Trend Micro anti-virus software version 14.0 and found to contain no known viruses.

*/s/ Renee Pietropaolo*
Renee Pietropaolo
Assistant Federal Public Defender

July 7, 2025

# CERTIFICATE OF SERVICE

I, Renee Pietropaolo, Assistant Federal Public Defender, hereby certify that I have electronically filed the Response and Reply Brief for Appellant/Cross-Appellee Oronde Shelton and served copies upon Filing User Adam Hallowell, Assistant United States Attorney, through the Third Circuit Court of Appeals' Electronic Case Filing (CM/ECF) system.

*/s/ Renee Pietropaolo*
Renee Pietropaolo
Assistant Federal Public Defender

July 7, 2025